IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
PANAMA CITY DIVISION

CASE NO. 5:23-cv-00127

KILLIAN CONSTRUCTION CO.,
a Missouri company,

     Plaintiff,

v.

PIER PARK RESORT HOTEL, LLC,
a Delaware limited liability corporation.

     Defendant.

_____/

## <u>PIER PARK RESORT HOTEL, LLC's, ANSWER, AFFIRMATIVE DEFENSES, AND COUNTERCLAIM</u>

Defendant, Pier Park Resort Hotel, LLC ("Owner") files this Answer, Affirmative Defenses, and Counterclaim to Plaintiff, Killian Construction Co.'s ("Contractor") Second Amended Complaint, and in support, states:

1.    Admitted that Contractor claims it is entitled to more than $75,000.00 and has brought causes of action sounding in breach of contract, breach of the implied covenant of good faith and fair dealing, unjust enrichment, and foreclosure of claim of lien; however, Owner denies these allegations.

2.    Admitted.

**Cole, Scott & Kissane**
www.csklegal.com

Miami | Fort Lauderdale West | Fort Lauderdale East | West Palm Beach | Orlando | Jacksonville | Tampa
Bonita Springs | Naples | Pensacola | Fort Myers | Tallahassee | Key West

3.     Owner is without knowledge as to the allegations in Paragraph and, therefore, denies the same.

4.     Admitted.

5.     Admitted.

6.     Admitted.

7.     Admitted.

8.     Admitted.

9.     Admitted.

10.    Admitted.

11.    Admitted.

12.    Admitted.

13.    Admitted.

14.    Admitted that Contractor claims it is entitled to more than $75,000.00 and that this Court has jurisdiction pursuant to 28 U.S.C. § 1332; however Owner denies this allegation.

15.    Admitted.

16.    Admitted that the contract at issue contains a clause stating the sole and exclusive venue of all litigation arising from or related to the contract shall be in any state or federal court in Bay County, Florida. The contract at issue speaks for itself and is the best evidence of same.

17.    Admitted that Contractor and Owner entered into a construction agreement (the "Contract"), dated December 21, 2020, for the construction of the hotel known as Panama City Beach Embassy Suites, located on the Site (the "Project"). The Contract at issue speaks for itself and is the best evidence of same.

18.    Denied as phrased.

19.    Denied as phrased.

20.    Denied.

21.    Denied.

22.    Denied.

23.    Denied.

24.    Denied.

25.    Denied.

26.    Denied.

27.    Denied.

28.    Denied.

29.    Denied.

30.    Admitted that Contractor submitted is Notice of Claim on March 7, 2022 for 160 days to be added to the schedule and for a $167,463.51 increase to the Contract's Guaranteed Maximum Price (the "GMP Sum"); however, Owner denies that this Notice of Claim was proper or legitimate.

31.     Denied as phrased. While it is accurate that Owner did not formally respond to this Notice of Claim and that Owner denied it as presented on June 21, 2022, Owner and Contractor had numerous discussions regarding the Claim, and as result it was revised multiple times. Owner denies that the Notice of Claim was proper or legitimate.

32.     Denied.

33.     Denied.

34.     Denied.

35.     Denied.

36.     Denied as phrased, as FF&E was not a critical path item.

37.     Denied as phrased.

38.     Denied.

39.     Denied.

40.     Denied.

41.     Denied.

42.     Denied as phrased.

43.     Denied.

44.     Denied as phrased.

45.     Denied as phrased.

46.     Denied.

47. Denied.

48. Denied as phrased.

49. Denied as phrased.

50. Denied as phrased.

51. Denied as phrased.

52. Denied as phrased.

53. Denied.

54. Denied as phrased.

55. Denied as phrased.

56. Denied as phrased.

57. Admitted.

58. Denied.

59. Denied.

60. Denied as phrased.

61. Denied.

62. Denied.

63. Denied.

64. Denied.

65. Denied.

66. Denied.

67. Denied as phrased.

68. Denied.

69. Denied.

70. Denied.

71. Denied as phrased.

72. Denied as phrased.

73. Denied as phrased.

74. Denied as phrased.

75. Denied as phrased.

76. Denied as phrased.

77. Denied as phrased. While it is accurate that the resulting reports concluded that CDM's work failed the AAMA 502 testing, the results are not reliable because neither CDM's nor the manufacturer's representatives were present and the tiedown process was not performed prior to testing.

78. Denied as phrased.

79. Admitted.

80. Admitted.

81. Denied as phrased.

82. Denied as phrased.

83. Denied as phrased.

84. Denied.

85. Denied.

86. Denied as phrased.

87. Denied.

88. Denied.

89. Denied.

90. Denied.

91. Admitted that this language appears in a broader provision in the Contract; however, Owner denies that this isolated quote fully illustrates the import of the Joint Checks provision in the Contract. The Contract speaks for itself and is the best evidence of same.

92. Denied as phrased.

93. Denied.

94. Admitted.

95. Denied.

96. Denied.

97. Admitted.

98. Admitted that this language appears in a broader provision in the Contract; however, Owner denies that this isolated quote fully illustrates the import

of the default provisions in the Contract. The Contract speaks for itself and is the best evidence of same.

99.   Denied as phrased.

100.   Denied as phrased.

101.   Denied as phrased.

102.   Denied as phrased.

103.   Denied as phrased.

104.   Denied as phrased.

105.   Denied as phrased.

106.   Denied as phrased.

107.   Denied as phrased.

108.   Denied as phrased.

109.   Denied as phrased.

110.   Denied.

111.   Denied.

112.   Denied.

113.   Denied.

114.   Denied as phrased.

115.   Denied as phrased.

116.   Denied.

117.   Denied.

118.   Denied as phrased.

119.   Denied.

120.   Denied.

121.   Denied.

122.   Denied.

## **COUNT I – BREACH OF CONTRACT**

123.   Owner incorporates its responses to Paragraphs 1-122 as if fully set forth herein.

124.   Admitted that Contractor claims it is entitled to more than $75,000.00 and brings claims sounding in breach of contract; however, Owner denies this allegation.

125.   Admitted that Owner and Contractor entered into a Contract for Contractor to serve as such on the Project; however, Owner denies that Contractor's duties were limited to common law duties because, by virtue of the Contract, Contractor's duties on the Project where heightened, including Contractor agreeing to act, in a professional capacity, as Owner's fiduciary, among other things, as more fully set forth in the Contract. The Contract speaks for itself and is the best evidence of same.

126.   Admitted.

127. Denied.

128. Denied.

129. Denied.

130. Denied.

## COUNT II – BREACH OF GOOD FAITH AND FAIR DEALING

131. Owner incorporates its responses to Paragraphs 1-122 as if fully set forth herein.

132. Admitted that Contractor claims it is entitled to more than $75,000.00 and brings claims sounding in breach of the duty and covenant of good faith and fair dealing; however, Owner denies this allegation.

133. Denied as phrased.

134. Denied as phrased.

135. Denied.

136. Denied.

137. Denied.

138. Denied.

## COUNT III – UNJUST ENRICHMENT

139. Owner incorporates its responses to Paragraphs 1-122 as if fully set forth herein.

140. Admitted that Contractor claims it is entitled to more than $75,000.00 and brings claims sounding in unjust enrichment; however, Owner denies this allegation.

141. Denied as phrased.

142. Denied.

143. Denied as phrased.

144. Denied.

145. Denied.

146. Denied.

147. Denied.

148. Denied.

## COUNT IV – FORECLOSRE OF CLAIM OF LIEN

149. Owner incorporates its responses to Paragraphs 1-122 as if fully set forth herein.

150. Admitted that Contractor claims it is entitled to more than $75,000.00 and brings claims sounding in foreclosure of claim of lien; however, Owner denies this allegation.

151. Denied as phrased.

152. Denied.

153. Denied.

154. Denied.

155. Admitted that Contractor recorded its claim of lien in the amount of $4,100,628.49; however, Owner denies that Contractor's lien is warranted or legitimate and thus denies this allegation.

156. Denied.

157. Admitted that Contractor served a copy of its Amended Claim of Lien on Owner on May 17, 2023; however, Owner denies that Contractor's lien is warranted or legitimate and thus denies this allegation.

158. Admitted that Contractor served Owner with the contractor's final payment affidavit on May 17, 2023; however, Owner denies that Contractor's lien is warranted or legitimate and thus denies this allegation.

159. Admitted.

## GENERAL DENIAL

Any allegations in the Second Amended Complaint that are not specifically admitted are hereby denied.

## AFFIRMATIVE DEFENSES

Owner asserts the following Affirmative Defenses to the Second Amended Complaint.

## First Affirmative Defense
(Prior Material and Anticipatory Breaches)

As further set forth in Counterclaim below, prior to any alleged breach by Owner, Contractor intentionally and unintentionally materially breached the Contract by acts and/or omissions which include, but are not limited to:

a.     failing to thoroughly and adequately review the plans, drawings and specifications prior to each phase of the Work, as defined in the Contract (the "Work");

b.     failing to coordinate and sequence subcontractors in order to timely and economically complete the Work;

c.     failing to competitively vet subcontractors and secure competitive pricing on behalf of its fiduciary (e.g., GCF, Blue Sky, Warren Door & Access Control, and Bormon);

d.     failing to balance the budget and schedule of values, despite numerous Owner requests;

e.     failing to timely and adequately submit Claims under the Contract in order to properly make a request to add days to the schedule or increase the GMP Sum;

f.     engineering a deceptive scheme to defraud Owner by hiding losses and delays;

g.     submitting numerous false Pay Requisitions ("Pay Apps"), waivers and releases of lien, and Schedules of Values ("SOV");

h.     failing to submit Pay Apps that comply with Article 8.4.4 of the Contract;

i.     failing to timely complete the project by the Substantial Completion Date ("SCD");

j.　failing to properly staff the Project with key personnel, as defined in the Contract ("Key Personnel") after Rob Simpson's resignation;

k.　breaching its fiduciary duty to the Owner to protect its financial interests by failing to act as a professional consultant, general contractor, and manager with "fiduciary responsibilities" to deliver "first-class quality" and to do so efficiently, expeditiously, and at the lowest reasonable cost that allowed occupancy by an agreed upon SCD that might allow an early opening;

l.　unilaterally stopping the Work;

m.　refusing to communicate with Owner after Contractor improperly demobilized its forces from the Project;

n.　revoking Owner's access to the Project management software, ProCore;

o.　unilaterally authorizing Owner's punch-list items;

p.　representing in writing that Contractor would not bond off Subcontractor liens and untimely failing to do so;

q.　failing to respond to numerous good faith invocations of Owner's audit rights;

r.　failing to ensure that all Subcontractor surety bonds for which it charged Owner, and for which Owner paid, were actually procured; and

s.　failing to ensure the Subcontractors paid lower tier subcontractors and suppliers promptly as it relates to labor, material, equipment and/or services furnished in connection with the Project, as required by the Contract.

### **Second Affirmative Defense**
(Unclean Hands)

Contractor should be denied any equitable relief, including enforcement of its lien, because it has unclean hands, as set forth more fully below in the Counterclaim.

### Third Affirmative Defense
(Unenforceable, Voidable, or Void Fraudulent Claim of Lien)

Contractor's Claim of Lien is unenforceable, voidable, and/or void because it fraudulently and willfully exaggerated its lien, as set forth in the Counterclaim below, particularly Paragraphs 112-146 and 244-279. Moreover, Contractor's Claim of Lien is unenforceable because it failed to substantially perform the Contract in accordance with its terms and committed intentional prior material breaches, as more fully set forth in Owner's First Affirmative Defense above.

### Fourth Affirmative Defense
(Release and Waiver)

As more fully set forth in the Counterclaim below, Contractor has waived and/or released Owner from all of its causes of action by its failure to comply with conditions precedent concerning Pay Apps and Claims under the Contract. Moreover, Contractor has waived and/or released Owner from all of its causes of action by executing Change Orders on certain subject matters, including cast in place concrete, and by executing numerous waivers and releases of lien.

### Fifth Affirmative Defense
(Durres)

As more fully set forth in the Counterclaim below, Owner's alleged failure to pay Contractor the amounts it claims are due is excused or justified because Owner was placed under economic duress by Contractor by its gross mismanagement of the Project and its fraudulent billing practices. Owner was forced to accept several

Change Orders, including CO 2R and CO 176R2, to avoid losing monies in lost profits on the delayed opening of a new hotel. The circumstances permitted no other alternative and resulted from coercive acts of Contractor, including threatening to lien the Project and ultimately doing just that.

## Sixth Affirmative Defense
(Setoff)

Owner is entitled to setoff against any award to Contractor for monetary losses Owner suffered resulting from the numerous intentional and unintentional material breaches committed by Contractor, or those for whom Contractor is responsible, as more fully set forth in the Counterclaim below.

## Seventh Affirmative Defense
(Estoppel)

Contractor is equitably estopped from bringing the claims contained in the Second Amended Complaint against Owner due to its multiple intentional and unintentional breaches, as more fully set forth in Owner's First Affirmative Defense above, including Contractor's deceptive scheme to lien the Project and bad faith practices.

## Eighth Affirmative Defense
(Waiver of Consequential Damages)

To the extent Contractor seeks special, consequential, or punitive damages from Owner, Contractor has explicitly waived such damages in accordance with the strictures of Article 24.15 of the Contract.

## Ninth Affirmative Defense
(Reservation of Right to Amend)

Owner reserves the right to amend its Affirmative Defenses as more information becomes available during the discovery process, particularly since Contractor failed on multiple occasions to honor Owner's audit rights, such that Owner was forced to wait until discovery commenced before it could even begin to audit Contractor.

## ATTORNEYS' FEES AND COSTS

Owner is obligated to pay undersigned counsel, as well as its predecessor counsel, reasonable fees and costs for its services. Contractor is liable to Owner for attorneys' fees and costs pursuant to, among other Contract provisions, Article 24.4 of the Contract. Contractor is also liable to Owner for attorneys' fees and costs incurred in connection with this action pursuant to Chapter 713, Florida Statutes.

## COUNTERCLAIM

Counter-Plaintiff, Pier Park Resort Hotel, LLC, ("**Owner**"), by and through its undersigned counsel, sues Counter-Defendant, Killian Construction Co. ("**Contractor**"), and for cause alleges:

1. This Court has jurisdiction over this Counterclaim because it is a compulsory counterclaim pursuant to Federal Rule of Civil Procedure 13(a).

2. Contractor is a corporation incorporated under the laws of the State of Missouri, with its principal place of business located at 2664 East Kearny Street, Springfield, Missouri 65803. Accordingly, Contractor is a Missouri citizen for purposes of diversity jurisdiction.

3. Owner is a limited liability company organized under the laws of the State of Delaware, with its principal place of business at 130 Richard Jackson Blvd. Suite 200, Panama City Beach, Florida 32407.

4. Owner's only two members are Key Panama City, LLC, a limited liability company organized under the laws of the State of Delaware, with its principal place of business at 848 Brickell Avenue Suite 1100, Miami, Florida 33131, and SJK Investor, LLC, a limited liability company organized under the laws of the State of Florida, with its principal place of business at 130 Richard Jackson Blvd. Suite 200, Panama City Beach, Florida 32407.

5. Key Panama City, LLC's, sole member is Key Int'l Investors II, LLC, a limited liability company organized under the laws of the State of Florida, with its principal place of business at 848 Brickell Avenue Suite 1100, Miami, Florida 33131, whose only two members are individuals, Diego and Inigo Ardid.

6. Diego Ardid is an individual domiciled in Miami-Dade County, Florida, and is a citizen of Florida for jurisdictional purposes.

7. Inigo Ardid is an individual domiciled in Miami-Dade County, Florida, and is a citizen of Florida for jurisdictional purposes.

8. SJK Investor, LLC, a limited liability company organized under the laws of the State of Florida, with its principal place of business at 130 Richard Jackson Blvd. Suite 200, Panama City Beach, Florida 32407, whose sole member is Resort Real Estate Holdings, LLC.

9. Resort Real Estate Holdings, LLC, is a limited liability company organized under the laws of the State of Florida, with its principal place of business at 130 Richard Jackson Blvd. Suite 200, Panama City Beach, Florida 32407, whose sole member is The St. Joe Company, Inc.

10. The St. Joe Company, Inc., is a corporation incorporated under the laws of the State of Florida, with its principal place of business at 130 Richard Jackson Blvd. Suite 200, Panama City Beach, Florida 32407, and is a Florida citizen for jurisdictional purposes.

11.    This Court has jurisdiction over this Counterclaim pursuant to 28 U.S.C. § 1332(a) because there is complete diversity of citizenship between the Parties and the amount in controversy exceeds Seventy-Five Thousand Dollars ($75,000.00) exclusive of interest, costs, and attorneys' fees and the parties are of complete diversity citizenship.

12.    Venue is proper in the Northern District of Florida pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to this Counterclaim occurred within the District and the property that is the subject of this Counterclaim is situated in the District.

13.    Moreover, the contract at issue contains a venue provision that the sole and exclusive venue of all such litigation arising from or related to the contract at issue shall be in any state or federal court in Bay County, Florida.

## I.    INTRODUCTION AND DESCRIPTION OF DISPUTE

### 1.    Contractor's Deceptive Scheme

14.    Many months before the November 15, 2022 Substantial Completion Date ("SCD"), Contractor realized it could not rectify its gross mismanagement of the project schedule and budget.

15.    Faced with this realization, Contractor began knowingly certifying false pay requisitions ("Pay App") to Owner, concealing its intent to draw as much money as it could from Owner's construction loan.

16.    Contractor perpetrated this deceitful scheme until Owner was forced to terminate the Contract and ultimately engage in this very dispute.

17.    Contractor made false representations in Pay Apps to induce Owner's lender ("Lender") into making advances ("Loan Advances") that had not come due.

18.    Contractor made these false representations until it was forced to reveal to Owner that:

a.  it could not and would not complete the job for the agreed upon guaranteed maximum price ("GMP Sum");

b.  it had concealed contractual claims for more time and more money ("Claims") for months until it drained nearly every remaining dollar from the Loan except for Subcontractor retainage;

c.  it intended to pursue those Claims by any means necessary, including concocting a false excuse — in flagrant contravention of the Contract — for not making the Claims in accordance with Article 6, based on an alleged oral agreement to "address Claims at the end of the job;"

d.  it planned to (and did) willfully and intentionally breach multiple conditions precedent to further Loan Advances and Owner's payment of the Subcontractor retainage; and

e.  then attempted to leverage Owner into paying some or all of the concealed Claims, exceeding the GMP Sum, and waiving Owner's entitlement to Liquidated Damages ("LDs"), by threat and use of the Construction Lien Law.

19.    In the Summer of 2022, Contractor's Senior Project Manager, Rob Simpson, notified Contractor's CEO, Tony Smith, that senior personnel did not know how to read the schedule, the budget was not being balanced, the project team

literally did not know the actual contract completion date, and Gary Clark, Contractor's Project Executive, planned to lien the job at the time most opportune to Contractor, in order to prevent any further advances by Lender so as to manufacture an Owner default under the Contract and loan documents and to leverage Owner into paying Contractor additional money by threat of foreclosing its lien on the property.

20. Contractor did precisely that in June 2022, and again in February of 2023 after drawing nearly the entire GMP Sum from the loan in January, except for subcontractor retainage.

21. In December of 2022, Contractor submitted Pay App 34, dated December 23, 2022, for the alleged cost of the work, as defined in the Contract ("Cost of Work") performed from December 1, 2022 through December 30, 2022.

22. Contractor was required to certify the representations in the Pay Apps and designated Gary Clark, its Project Executive, as the individual authorized to bind the company to the truth or falsity of the certified statements.

23. In Pay App 34, Contractor calculated the Total Earned Less Retainage and the Current Payment Due amounts based on the Total Cost of Work Completed and Stored to Date of $53,640,922.44, which was less than the GMP Contract Sum to Date of $54,199,773.14.

24. In Pay App 34, Contractor, through Mr. Clark, attached a Schedule of Values, in which it represented the Work was 99% complete with $3,998,343.00

withheld in retainage, and $558,850.71 remaining on the theretofore undisputed GMP Sum of $54,199,773.14.

25.    Pay App 34 was accompanied by Contractor's Waiver and Release of Lien and Claims Upon Progress Payment — Exhibit "O" to the Contract, also dated December 23, 2022.

26.    Though the form also allowed any Claims to be excepted from the scope of the release,  Contractor did <u>not</u> identify any Claims.

27.    The only exceptions to the scope of the conditional release were retainage and labor, services, and materials furnished by Contractor after the release date.

28.    In Pay App 34, Contractor certified that "to the best of Contractor's knowledge, information and belief . . . all amounts have been paid by Contractor for work for which previous Certificates for Payment were issued and payments received from the Owner."

29.    In Pay App 34, Contractor certified under Article 8.4.4. of the Contract that:

    a.  **"there are no liens or claims [a strictly defined term under the Contract] outstanding or known to exist** at the date of the Requisition, other than as indicated in writing in such Requisition;"

    b.  **"all due and payable bills with respect to the Work have been paid to date**, **or have been included in the amount requested in the previous Requisition;"**

c. "there is **no known basis for the filing of any construction liens or claims or any other lien or claim whatsoever on the Work**, the Project, or the Site;"

d. Contractor is entitled to payment under the Contract in the amount requested;

e. "there are **no outstanding PCOs or CORs other than those PCOs and/or CORs included within Contractor's Monthly Report**;" and

f. "there are **sufficient funds left in the GMP to complete the Work.**" (Emphasis added)

30.    Those certifications were <u>false</u>.

31.    In paragraph 3 of that Waiver and Release of Lien, Contractor released all claims for Work performed prior to the Release Date, with the only exceptions to the scope of the release being retainage and labor, services, and materials furnished by Contractor after the Release Date. Contractor did not identify any Claims in the space dedicated for the Claims to be listed.

32.    In paragraph 6 of that Waiver and Release of Lien, Contractor represented and warranted that "**all of Contractor's Lienors, employees, and representatives have been, or will, be fully paid for all labor, materials, equipment and/or services furnished to the Project or the Property prior to, and including, the Release Date.**" (Emphasis added).

33.    In paragraph 4 of that Waiver and Release of Lien, Contractor agreed to indemnify Owner from all damages Owner incurs by reason of any Claim, claim,

lien, judgment, liability, suit, lawsuit, demand, debt, liability, proceeding, action or cause of action, asserted, or brought, by any subcontractor (any tier) "**seeking payment for labor, materials, equipment and/or services that they furnished to the Project or the Property prior to, and including, the Release Date.**"

34.    After payment for Pay App 34 cleared Contractor's account, Contractor revealed its deceitful scheme and tendered an unconditional Partial Waiver and Release of Lien that included:

> As we have discussed throughout the project and as has been the custom on the Project, **we have withheld claims from prior pay applications and waited until the end of the project to review claims**, including excusable and compensable delays, cost overruns that are covered by the contract and other miscellaneous claims not caused by contractor's management of the project. As the project is winding down, we are prepared to present these claims at your convenience.

35.    By including the express reservation of previously waived claims and requests for change orders, Contractor modified the form of waiver required by the Contract and Loan Agreement, repudiated the Contract, and failed to satisfy conditions precedent to Contractor's and Lender's duties to review and pay the amount requested, or any further amounts for which Contractor applied.

36.    Contractor also prevented Owner from satisfying conditions precedent to obtaining further advances from Lender, impairing Owner's ability to fund future Pay Apps.

37.    Before Owner or Lender were required to "review, approve, reject, dispute and/or pay" each Pay App, the Loan and Construction Agreement required Contractor to:

    a.  certify with each Pay App that it would finish the Work for no more than the GMP Sum;

    b.  calculate progress and final payments calculated from the initial "Schedule of Values", amended only as previously approved by Owner;

    c.  calculate those payments based on a "Total Cost of Work Completed and Stored" that did not exceed the GMP Sum to date;

    d.  calculate those amounts using a balanced Pay App in which the Subcontract Amounts on the Subcontracts were identical to the value of that Subcontractor's Work items in the agreed Schedule of Values; and

    e.  furnish conditional and unconditional releases and waivers of claims releasing all claims other than those expressly identified in the schedule on the release forms.

38.    Submitting a litany of demonstrably false certifications, Contractor did not comply with any of these requirements.

39.    In Pay Apps 35 through 38, Contractor:

    a.  revealed it would not honor the GMP as the maximum amount it would charge the owner by calculating the "Total Earned Less Retainage" and the "Current Payment Due" amounts using the "Total Cost of Work Completed and Stored to Date" which exceeded the GMP Sum to Date;

    b.  amended Work items in the Schedules of Values without the prior written approval of Owner, which Contractor had done on multiple occasions before these Pay Apps;

c. refused to and failed to pay any and all costs, fees, or expenditures in excess of the GMP Sum in compliance with Article 5.9, which makes Contractor solely responsible to pay any and all costs, fees, or expenditures in excess of the GMP, without entitlement to reimbursement from Owner;

d. tendered Contractor's Conditional Partial Waivers and Releases of Lien and Claims Upon Progress Payment that excluded Claims which had not been submitted in compliance with:

   i. Article 6.11 — to be submitted no later than ten (10) days after the occurrence of the event, circumstance, condition, omission, or act giving rise to the Claim;

   ii. Article 6.12 —

      1. to describe the factual basis upon which the Claim is made in the form of a written narrative that describes in reasonable detail the event, circumstance, condition, omission, or act giving rise to the Claim, including the date that such event, circumstance, condition, omission, or act giving rise to the Claim occurred;

      2. to describe the specific contractual relief requested by Contractor with an accompanying written explanation thereof that identifies the terms of the Contract upon which Contractor's request is based; and

      3. if the Claim is for an increase in the GMP, to describe the actual adjustment in the GMP (in terms of a specific dollar amount) requested by Contractor;

   iii. Article 6.13 — to be delivered with all documentation that supports the Claim, including copies of invoices, Subcontracts, and reports, if any, sufficient to allow Owner to audit the Claim; and

e. tendered unconditional Contractor's Partial Waivers and Releases of Liens that were not in accordance with the Contract.

40.     Ultimately, Contractor would: a) induce various Subcontractors to file claims of lien on Owner's property; b) itself file a claim of lien for the same amounts allegedly due and owing; and c) consequently create a double, and sometimes triple, cloud on title.

41.     By precluding Owner's access to loan proceeds and, simultaneously, forcing Owner into defending against various claims of duplicate and triplicate liens, Contractor attempted to force Owner into submission.

42.     Contractor executed its deceitful scheme by refusing to pay its Subcontractors their retainage without explaining to some, or all of them, that Owner could not access the Loan to pay them because Contractor, Owner's fiduciary, intended to leverage Owner to waive its damages claims, pay Contractor the remaining loan balance, and allocate Owner's liquidated damages claim between delays attributed to Contractor and its Subcontractors so that Contractor could pass through the claims to the Subcontractors to settle those claims for far less than the amounts due per its Contractor's Final Payment Affidavit (and pocket the difference).

43.     Worse, when Owner ultimately opted to release retainage to Subcontractors, Contractor employed any number of bad faith tactics to interfere with Owner's good faith efforts. Among those tactics were again leveraging Owner to:

    a.  develop Contractor's critical path theories so that Contractor could assert claims against the Subcontractors;

    b.  identify Subcontractors responsible for defective scopes of Work so that Contractor could assert claims against the Subcontractors;

    c.  waive Owner's liquidated damages, delay, and key personnel claims; and

    d.  waive claims against Contractor for defective construction.

## 2.    Pre-Construction Services

44.    In 2017, Owner decided to explore the possibility of erecting a 255-suite upscale beach resort, known as Embassy Suites by Hilton (the "Hotel").

45.    The Hotel would be located adjacent to Pier Park — Panama City Beach's premier shopping and entertainment center — but also right on Front Beach Road, with unobstructed views of the Gulf of Mexico.

46.    Owner would offer full-service amenities, from where the Hotel's guests could overlook and enjoy the gorgeous Panama City beach.

47.    The Hotel would boast approximately 15,000 square-feet of event space, two restaurants, indoor and outdoor bars, an outdoor pool, a fitness center, a business center, and seven meeting rooms.

48.    Recognizing the significant competition for hotel, conference, convention, and tourist business in Panama City, it was important to Owner that the construction of the Hotel (the "Project") be timely designed and constructed with a carefully developed and controlled construction budget.

49.    The Hotel was to be of "first-class" quality.

50.    In March 2018, Owner entered into a written agreement ("Design Agreement") with the architect firm, Rabun Architects ("Architect") relating to the design of the Hotel, with Architect's services to be provided in phases.

51.    Relatedly, Owner and Contractor executed a 263-Page Guaranteed Maximum Price ("GMP") Construction Agreement (the "Contract"), a copy of which is attached and incorporated as Exhibit "A," as a result of Contractor's response to Owner's bid solicitation, during which Contractor acknowledged and accepted the risk associated with the GMP Sum.

52.    In the Contract, Contractor affirmed that it was intimately familiar with the plans based upon Contractor's performance of the "Pre-Construction Services" ("PreCon") rendered as part of the bidding process and Work performed as part of the first phase of the Project, before termination due to COVID.

53.    The GMP Contract provides for extensive PreCon, as follows:

*Pre-construction Services* — All of the labor, materials, and services that Contractor furnished and/or performed for Owner in connection with the Project prior to the Execution Date pursuant to a separate written agreement with Owner, which include, but are not limited to: (i) the entire completed construction of the foundation for the Project, and (ii) the review and evaluation of the Plans **to ensure that they are complete, coordinated, constructible, and are otherwise fully adequate to take into account all work, labor, materials, and equipment required for the completion of the Work.**

(Emphasis added).[1]

54.    The definition of the Work in the Contract encompasses "all of the labor, materials, and services . . . on the Project and to the Site prior to the Execution . . . including the Pre-construction Services . . ."[2]

55.    The Contract unambiguously provides that:

**Owner makes no representation or warranty to Contractor**, whether express or implied, **that the Plans are complete, coordinated, constructible**, and are otherwise fully adequate to take into account all work, labor, material, and equipment required for the completion of the Work. **Contractor affirms that it has thoroughly reviewed the Plans and** that **it is intimately familiar with the with the Plans based upon Contractor's performance of the Pre-Construction Services. Contractor further affirms that, as part of the Pre-construction Services, Contractor reviewed and evaluated the Plans for the purpose of ensuring that they are complete, coordinated, constructible**, and are otherwise fully adequate to take into account all work, labor, material, and equipment required for the completion of the Work **prior to issuing the Plans for bid. Contractor hereby acknowledges that Owner, by entering into the Contract, has relied upon Contractor's review and evaluation of the Plans prior to issuing them for bid. Accordingly, Contractor is not entitled to an adjustment of the GMP, or extension of the Contract Time, based upon completeness, coordination, constructability or adequacy of the Plans, including the allegation or fact, that the Plans are incomplete, not coordinated, not constructible**, inadequate or otherwise fail to take into account all work, labor, material, and equipment required for completion of the Work.

(Emphasis added).[3]

---

[1] Ex. "A," Art. 1.2.70.
[2] *Id.*, Art. 1.2.97.
[3] *Id.*, Art. 11.1.

\*      \*      \*

Contract Documents are complementary, Contractor shall, before starting each portion of the Work, carefully study and review the various Contract Documents . . . These obligations are, in part, for the purpose of facilitating coordination and construction by Contractor.

56.     Contractor was not entitled to an adjustment of the GMP Sum based upon constructability, as the Contract provides for a "Constructability Review" during the first 60 days of the Project, the purpose of which is to assist Contractor with its management of the Project and its ability to control the Cost of the Work.[4]

57.     The cost of the Constructability Review was included as part of Contractor's Fee under the Contract.

58.     Even though the Constructability Review would have assisted Contractor a great deal with regard to managing the Cost of the Work, Contractor opted to forego the Constructability Review.

59.     Contractor's scope also included a mechanical, electrical and plumbing ("MEP") coordination allowance, and a 3D Room Mockup allowance, both of which Contractor also failed to execute, ultimately refunding Owner the unused allowances.

60.     Opting to forego the Constructability Review, and failing to execute on the MEP Coordination and 3D Room Mockup, demonstrates Contractor's

---

[4] *Id.*, Art. 10.2 and Exhibit G-1 thereto, Para. 12.

dereliction of duty and careless planning with regard to the Project schedule —

potentially the first domino in Contractor's gross mismanagement of the Project.

61.     Under these circumstances, Contractor made a wager that it could build

the Hotel for a cost not to exceed Forty-Nine Million, One Hundred Eighty-Six

Thousand, Two Hundred-Seven 00/100 Dollars ($49,186,287.00), absent an

enforceable modification to the Contract.[5]

### 3.     The Project

### a.     As Fiduciary, Contractor Guaranteed Owner a Cost Cap and Completion Date

62.     Based on Contractor's representations about its experience and

proficiency, its advantages over competitors, the economies of scale it could

leverage, the quality and efficiency of its work, and the reliability on the PreCon,

Owner entered in a GMP Contract with Contractor on December 21, 2020 (applying

retroactively to August 19, 2019) which explicitly provides that the GMP "is the

maximum amount of the Contract Sum . . . [a]ll costs in excess of the [GMP Sum]

**shall be paid solely by Contractor without reimbursement from Owner**."[6]

63.     A GMP contract, such as the one here, is a type of an open-book

contract in which all of the contractor's costs are supposed to be transparent to the

project owner, in order to allow the owner to know the contractor is not negligently

---

[5] *Id.*, Art. 5.2.
[6] *Id.* (emphasis added).

or intentionally running up those costs to hit the maximum price or, worse, go beyond it.

64.    The nature of this GMP Contract was that Contractor would act as a professional consultant, general contractor, and manager with "fiduciary responsibilities" to deliver "first-class quality" and to do so efficiently, expeditiously, and at the lowest reasonable cost that allowed occupancy by an agreed upon Substantial Completion Date ("SCD") that might allow an early opening.[7]

65.    Contractor acknowledged "Owner's reliance . . . and covenant[ed] . . . to perform, and cause each Subcontractor . . . to perform [] the Work in an expeditious and economical manner consistent with the Owner's interest."[8]

66.    To achieve Owner's objectives, Contractor, among other things:

   a.  guaranteed it would not charge more than the original GMP Sum adjusted by written change orders signed by both parties;[9]

   b.  agreed to submit periodic applications for payment on forms customarily used by Contractor and Lender, billed by progress measured against a Schedule of Values ("SOV") in which the total value of all work items did not exceed the GMP Sum;

   c.  agreed Change Order and Claims requirements were conditions precedent to payment of costs in excess of the GMP Sum;[10]

   d.  prospectively waived payment of those costs based on unsatisfied conditions to payment, as well as proposed change orders ("PCOs")

---

[7] *Id.*, Art. 2.1.
[8] *Id.*
[9] *Id.*, Art. 24.5.
[10] *Id.*, Art. 5.5.

and Claims not made in strict compliance with time and substance requirements;[11]

e. with each application for a progress payment, released all Claims against Owner arising out of that portion of the Work performed prior to the period for which it requisitioned payment, conditioned on payment;

f. with each application for a progress payment, unconditionally released all Claims against Owner arising out of that portion of the Work performed prior to the period for which it requisitioned payment; and

g. agreed the Contract could be amended only by written agreement signed by both parties.[12]

67. Capped by the GMP Sum, the Contract required Owner to pay Contractor <u>only</u> the Contract Sum, comprised of the Cost of the Work, Contractor's Fee, Contractor's General Conditions, and permitted Contingency in exchange for Contractor's compliance with its contractual obligations.[13]

68. Tediously defined in Article 5 (over ten pages in length) of the Contract, the section devoted to the Contract Sum reiterated the contractual safeguards afforded Owner, particularly as it relates to the GMP Sum and Contractor's role as fiduciary.

69. The safeguards include, but are not limited to, the following:

5.3   <u>Cost of the Work</u> . . . shall mean only those costs described in this Section . . . Contractor shall use its best efforts, as Owner's

---

[11] *Id.*, Art. 6.1.14.
[12] *Id.*, Art. 1.2.18.
[13] *Id.*, Art. 5.1.

fiduciary, to achieve the lowest prices and costs reasonably available and consistent with the Contract Documents for all portions of the Work.

*    *    *

5.3.2 <u>Costs of Material and Equipment Incorporated in the Work</u> . . . The costs of materials and equipment must be charged to Owner as the lowest rates reasonably available and consistent with the Contract Documents . . . Contractor shall use its best efforts, as Owner's fiduciary, to achieve the lowest cost or price reasonably available and consistent with the Contract Documents.

*    *    *

5.5    <u>General Conditions Costs</u> . . . Contractor shall be solely responsible to pay any General Conditions Costs incurred by Contractor in excess of the General Conditions Costs Cap, without a reimbursement or compensation from Owner . . . Contractor shall maintain line item integrity with respect to the categories of costs included within Contractor's General Conditions Costs **and shall not reallocate funds without Owner's prior written approval** . . . [and again] Contractor shall use its best efforts, as Owner's fiduciary, to achieve the lowest prices and costs reasonably available and consistent with the Contract Documents for all portion of the Work.

*    *    *

5.8    <u>Non-Allowable Costs</u> . . . shall mean any direct and/or indirect cost, item, or expense that is not included within, and chargeable to Owner as, a Cost of the Work . . . All such Non-Allowable Costs are included in Contractor's Fee regardless of whether they exceed the amount of Contractor's Fee . . . Non-Allowable Costs include costs, items, and expenses listed below:

5.8.1  the cost, whether direct or indirect, of any item not specifically and expressly included as a Cost of the Work, Contractor's Contingency, Contractor's Electrical Contingency, or General Conditions Costs;

5.8.2  **any cost in excess of the Guaranteed Maximum Price**;

5.8.3  General Conditions Costs in excess of the General Conditions Costs Cap;

\*      \*      \*

5.8.7  all direct and indirect costs arising out of the fault or negligence of, or failure to comply with the terms of the Contract Documents or any Subcontracts by, Contractor, any Subcontractor or Sub-subcontractor of any tier, or anyone directly or indirectly employed by any of them . . .

5.8.8  all direct and indirect costs of any nature relating to warranty Work . . .

\*      \*      \*

5.8.10 all direct and indirect costs of any nature resulting from or attributable to Delays, disruptions, or interferences in the performance of the Work, excepting only those . . . which are expressly identified and permitted  in accordance with Article 5 of this Agreement;

\*      \*      \*

5.8.14 except to the extent expressly provided in Section 5.6 of this Agreement, costs of repairing defective or non-conforming Work or Work that is damaged by Contractor, a Subcontractor, a Sub-subcontractor, or their employees [and] agents . . .

\*      \*      \*

5.8.22 all other direct, indirect, and/or overhead costs of any nature whatsoever, except as otherwise expressly provided to the contrary in the Contract Documents.

\*      \*      \*

5.9   Cost Overruns. **Contractor shall be solely liable and responsible for, and shall pay, any and all costs, fees, and other expenditures in excess of the [GMP Sum] for, and/or relating to, the Work, without entitlement to reimbursement from Owner. Contractor is not entitled to any fee, payment, compensation, or reimbursement under the Contract other than as expressly provided in Article 5.**

5.9.1   Contractor is aware of the possibility that the costs of the labor, equipment, and materials necessary to perform the Work may increase or escalate. Contractor shall at no time claim that the GMP was predicated on obtaining materials from any particular or usual source of supply. If the costs . . . increase or escalate . . . for any reason whatsoever . . . then Contractor shall be solely responsible to pay for the increased or increases in, or the escalation of, the costs . . . unless Contractor incurs such increase costs [as] an Allowance Item (as defined herein).[14] **Contractor represents that the GMP contemplates, and accounts for, the risk of increases in, or**

---

[14] "Allowance" is defined in Article 5.10 as only those items specifically identified on Exhibit B to the Contract, as follows:

**EXHIBIT B         ALLOWANCES**

1. Pavers at the 5th floor outdoor terrace have not been specified. We have included an allowance of $5.00 per square foot for materials and $5.00 per square foot for installation.
2. We have included an allowance of $15,000 grinding and preparation of concrete at balcony ceilings to receive paint.
3. We have included an allowance of $25,000 for door hardware at the storefront entry doors.
4. We have included an allowance for 7 cabanas at $10,000 each. No design provided.
5. The design of the remote beer system is not complete. We have included an allowance of $67,000 for the beer lines conduit, beer lines, power pack, etc. as needed to complete the remote beer system.
6. We have included an allowance of $36,525 for HVAC isolation valves and filters needed to isolate the VRF HVAC system during construction.
7. We have included an allowance of $69,165 for additional project management/project coordination associated with the HVAC & Electrical trades.
8. We have included an allowance of $50,000 for virtual 3-D room mock-ups.
9. We have included an allowance of $10,000 for site clean-up due to the project delay.
10. We have included an allowance of $10,000 for clean-up, repair or replacement of existing reinforcing steel damaged by exposure due to the project delay.
11. We have included an allowance of $10,000 for repairs to the existing subgrade damaged by exposure due to the project delay.

**escalation of, the costs of labor, equipment, and materials necessary to perform the Work.**[15]

70.     Simply put, as fiduciary, Contractor guaranteed a maximum price of the Contract, with few, extremely specific exceptions for which the contracting parties went to great lengths to explicitly define — "Pay Apps" to be submitted pursuant to similarly well-defined contractual terms and conditions.

71.     Still, Contractor claims it is entitled to monies that exceed the GMP Sum by nearly $8,000,000.00.

**b.     As Fiduciary, Contractor Committed to a Detailed and Comprehensive Payment Protocol**

72.     Article 8 of the Contract required Contractor to submit Pay Apps certified in accordance with an Owner-approved Schedule of Values ("SOV"),[16] computed "by multiplying the percentage completion of each of portion of the Work by . . . Cost of the Work allocated to that portion of the Work in the Schedule of Value, less applicable retainage," prior payments, shortfalls, and amounts Architect withheld.[17]

73.     The Contract explicitly prohibited Contractor from changing the SOV "without the prior, written consent of Owner."[18]

---

[15] *Id.* (Emphasis added).
[16] *Id.*, Art. 8.1.
[17] *Id.*, Art. 8.2.3.
[18] *Id.*, Art. 8.1.

74.    Contractor was required to provide with each Pay App, waivers required by Owner and Lender, including an unconditional Contractor's waiver and release of lien and claims,[19] covering the full amount of all prior payments and Work performed through the end of the period covered by Contractor's previous requisitions, a conditional partial waiver and release of lien[20] covering the full amount of the payment sought by Contractor and Work through the end of the period covered by Contractor's current Pay App (typically the last day of each month), similar releases from the Subcontractors and Sub-subcontractors in which Contractor was also released, and a final waiver and release of lien for each Subcontractor who completed its work.[21]

75.    Failure to comply with Article 8, or otherwise provide any of the support Contractor was required to submit with each Pay App rendered the Pay App "incomplete and rejected by Owner without further action."[22]

76.    That is, Owner and Lender had no obligation to review, approve, or dispute a Pay App until Contractor delivered one that was contractually-compliant.[23]

77.    Contractor's Pay Apps:

> . . . constitute[d] a certification and representation by Contractor to Owner . . . that: . . . (ix) **Contractor has not adjusted line items in the Schedule of Values without** the prior, **written consent** of Owner;

---

[19] Contractor was required to use the waiver and release of lien form attached as Exhibit "O" to the Contract.
[20] Contractor was required to use the waiver and release of lien form attached as Exhibit "S" to the Contract.
[21] *Id.*, Art. 8.4.1.
[22] *Id.*, Art. 8.4.2.
[23] *Id.*, Art. 8.2.1 and 8.4.2.

(x) there are **no outstanding PCOs or CORs other than those** PCO and/or CORs included **in Contractor's monthly report** . . . **and** (xii) **there are sufficient funds left in the GMP to complete the Work.**[24]

78.     On multiple occasions, Contractor willfully and wantonly made unilateral adjustments in the SOV, and made material misrepresentations in Pay Apps, including without limitation that there were sufficient funds left in the GMP to complete the Work.

79.     Apart from these deviations from the Contract, on several occasions, Contractor failed to comply with the terms of the Contract by continuously submitting delayed and/or incomplete Pay Apps that resulted in the alleged late payments to Contractor, severely impacting the Project by causing manpower shortages and significant loss of production at critical stages of construction.

### c.     Increases to the GMP Sum had to follow a Clearly Defined Claims-Reduced-to-Change-Order Process

80.     The Contract Documents are defined as consisting of the Contract, including all exhibits thereto, the plans, "Change Directives, Change Orders, Field Orders, written amendments to the Contract **signed by both Parties**," together with miscellaneous documents listed in exhibit "E" thereto."[25]

81.     The Contract's non-waiver clause prohibited both parties from relying on representations, promises, oral agreements, or course of dealings, providing:

---

[24] *Id.*, Art. 8.4.4 (Emphasis added).
[25] *Id.*, Art. 1.2.20. (Emphasis added).

"[t]he provisions of the Contract shall not be added to, modified, changed or waived, either expressly, impliedly or by course of conduct. The Contract may be amended only by (i) written amendment to the Agreement signed by both Parties, (ii) a Change Order, (iii) a Change Directive, or (iv) a Field Order."[26]

82.     Within the Contract, Contractor represented, warranted, and guaranteed to Owner that the Contract Sum would not exceed $49,186,287.00, unless adjusted by the parties' written agreement.[27]

83.     The Contract defined a request to adjust the GMP as a "Claim" that, if agreed to, was to result in a Change Order modifying the GMP Sum.[28]

84.     "Claim" is defined in the Contract as:

[a] demand or assertion by Owner or Contractor seeking, as a matter of right, an adjustment of the [GMP Sum] or an extension of the Contract Time, or both, or other relief with respect to the terms of the Contract. A demand for money or services by a third party is not a Claim. The burden of substantiating a Claim shall rest with the Party making the Claim.[29]

85.     In response to any revisions to Contract Documents, such as design changes or increased scope, Contractor was required to provide Owner a proposed change order (or "PCO"), stating Contractor's potential requested monetary or time

---

[26] *Id.*, Art. 24.5.
[27] *Id.*
[28] *Id.*, Art. 6.
[29] *Id.*, Art. 1.2.15.

adjustment, within 10 days after the revision or potential revision to the Contract Documents.[30]

86.    For each PCO, Contractor was required to submit a corresponding Change Order Request ("COR") to Owner, within 10 days of issuance of the PCO.[31]

87.    Change work performed by Contractor without a Change Order or Change Directive constituted "Contractor's acceptance that the change in the Work performed [was] part of the Contract Time and the then current [GMP]."[32]

88.    The required contractual process for submitting Claims entailed the following:

> **Contractor must deliver each of its Claims to Owner** in the form, and with the information, required herein **no later than ten (10) days after the occurrence of the event, circumstance, condition, omission, or act giving rise to the Claim**, unless such Claim is based upon an alleged Unavoidable Delay or Owner Caused Delay, in which case Contractor shall deliver such Claim to Owner, in the form required herein, no later than ten (10) days after the commencement of such Owner Caused Delay or Unavoidable Delay, as the case may be.[33]

89.    Again, "[t]he burden of substantiating a Claim [was to] rest with the Party making the Claim."[34]

---

[30] *Id.*, Art. 7.4.
[31] *Id.*
[32] *Id.*, Art. 7.1.1.
[33] *Id.*, Art. 6.11. (Emphasis added).
[34] *Id.*, Art. 1.2.12 and 1.2.15.

90.     Contractor was required to submit all Claims to Owner in a written narrative, describing its factual and contractual bases, the date cause for the Claim occurred, and "the actual_adjustment in the GMP (in terms of a specific dollar amount).[35]

91.     A Claim was not approved "unless it was in writing" and "memorialized by Change Order."[36]

92.     "Each of Contractor's Claims [was] subject to audit by Owner and [was to] be delivered with all documentation that support[ed] the Claim . . ."[37]

93.     Contractor waived and released any Claim that was not in strict compliance with the Contract."[38]

94.     In accordance with the Claims-reduced-to-Change-Orders process, the GMP was ultimately increased by $5,067,486.59 to $54,253,774.59.[39]

95.     There is no doubt the GMP Sum for this Project is **$54,253,774.59**; hence Contractor's lien in the amount of $4,100,628.49,[40] not $11,862,986.86.

---

[35] *Id*., Art. 6.1.2.
[36] *Id*., Art. 6.1.15.
[37] *Id.*, Art. 6.1.3.
[38] *Id.*, Art. 6.1.6 and 6.1.14.
[39] Ex. "B."
[40] The discrepancy on the total amount, $54,253,774.59, instead of the stated amount on CO #306 ($54,251,853.93) is due to minor accounting errors, about which Contractor has been made aware.

**d.      Extensions to the Substantial (and Final) Completion Date had to follow the Same Clearly Defined Claims-Reduced-to-Change-Order Process**

96.     Noting in conspicuous bold font with all letters capitalized that "**THE CONTRACT TIME IS OF THE ESSENCE,**" Article 4.2 of the Contract originally required Contractor to "achieve Substantial Completion of the Work" by "no later than February 11, 2022," the so-called SCD.[41]

97.     Final Completion was to be achieved no later than February 25, 2022.

98.     The SCD was amended by executed Change Order to November 15, 2022.[42]

99.     As with the alleged increased GMP amount of $54,253,774.59, a Change Order further extending the revised November 15, 2022 SCD does <u>not</u> exist — which is why Owner believes Contractor did not attach the Contract to its Complaint.

100.    "Substantial Completion" is not achieved until "Owner may use the Work (or a specified part thereof) for the purposes and uses for which it is intended . . ." and until a variety of requirements are satisfied, including that:

> a. Franchisor[43] has approved the Work for the purpose of having Hotel guests in the normal course of hotel operations;

---

[41] Ex. "A," 4.2. (Emphasis supplied).
[42] Ex. "C."
[43] The Contract defines "Franchisor" as the Hilton Franchise Holding LLC — the hotel operator.

b. all licenses, permits, and approvals applicable to the Work have been issued by all governmental authorities so that the building may operate as a hotel;

c. temporary certificates of occupancy for the Work have been duly issued by the governmental authority having jurisdiction thereof;

d. Contractor has discharged all claims of lien with respect to any completed Work;

e. Architect has issued a written AIA form Certificate of Substantial Completion;

f. the Work is in "Move-In Condition," subject only to "Punch List Work," which Contractor must complete in accordance with Exhibit "H" to the Contract;

g. all mechanical equipment, plumbing fixtures, and mechanical devices have been properly commissioned and operating as intended;

h. HVAC and alarm systems have passed all tests and been appropriately commissioned;

i. Contractor has delivered to Owner all keys to all locks; and

j. Contractor has prepared, and Owner has approved, all "Punch Lists" as per Exhibit "H" to the Contract.

101. The Architect did not issue his Certificate of Substantial Completion until April 25, 2023, 162 days after the SCD, for a variety of reasons including:

a. opting to forego the Constructability Review;

b. failing to furnish coordination drawings prior to installation;

c. failing to supervise and direct the Work, using its best skill and attention;

d. failing to adequately coordinate and sequence its Subcontractors' work;

e. failing to carefully study and review the various Contract Documents before staring each portion of the Work; and

f. staffing the Project with management that was not tracking and did not have any regard for the Project Schedule.

102. Notably, Contractor is not entitled to a time-extension or compensation for delays caused, in whole or in part, by its or its Subcontractors' own acts, omissions, negligence, fault, or *default*.[44]

### e.     Failure to Achieve Substantial Completion within the Contract Time Entitles Owner to Significant Liquidated Damages

103. The Contract provides that Contractor's failure to timely achieve Substantial Completion entitles Owner to LDs as follows:

a. for individual Units, $30.00 per Unit, per day, for the first sixty days following the expiration of the Contract Time, and $45.00 per Unit, per day, for every date thereafter until Contractor achieves Substantial Completion of each Unit for each Unit that Contractor fails to Substantially Complete prior to the expiration of the Contract Time; and

b. for Common Areas, $2,000.00 per day, following the expiration of the Contract Time, until Contractor achieves Substantial Completion of the Common Areas.[45]

---

[44] Ex. "A," Art. 6.1.9.
[45] Ex. "A," Art. 8.9.

104. The Architect, as alluded to above, issued the Certificate of Substantial Completion on Tuesday, April 25, 2023, entitling Owner to 162 days of LDs, amounting to $1,953,450.00.

105. Contractor's failure to properly staff the Project, under Article 11.3.3.1 of the Contract, entitles Owner to an additional $100,000.00 in LDs, a condition Contractor failed to satisfy when Contractor's Senior Project Manager, Robert Simpson, resigned his employment and Contractor failed to replace him on the Project.

106. Additionally, and as further set forth below, Contractor has failed to comply with Section 8.9.4 of the Contract by failing to satisfy, release, or transfer several Subcontractor liens from the Project.

107. Consequently, Contractor has been incurring additional liquidated damages, at $13,475.00 per day, for every day since June 8, 2023 ("Additional LDs").

108. On June 8, 2023, Owner sent a demand letter to Contractor, stating that if Contractor:

> complies with Section 8.9.4 and 11.16 within the next five (5) days, Owner will forego its entitlement to these Additional LDs for failure to satisfy and/or remove the liens from the Project, and provide [Contractor] with a release strictly limited to these Additional LDs. Should [Contractor fail] to do so, Owner will seek Additional LDs incurred due to [Contractor's] failure to satisfy and/or remove the liens

from the Project until the date of complete satisfaction or final disposition of this dispute.[46]

109.  Contractor did not respond to Owner's demand.

110.  By failing to respond to the demand within five days, or ever, Contractor rejected the demand, in spite of Owner's good faith efforts to excuse Contractor from this enforceable liquidated damages provision, to which Contractor had freely and openly agreed.

111.  To this end:

    a.  Contractor has "waive[d] all claims and defenses that the liquidated damages established, and agreed upon . . . are a penalty;[47]

    b.  Contractor expressly agree[d] the liquidated damages established in the Contract were not "intended . . . [to] induce performance by Contractor;[48]

    c.  LDs "are not reimbursable expenses under the GMP;[49]

    d.  "At Owner's sole and exclusive discretion, liquidated damages may be deducted from the unpaid portion of the Contract Sum, including Retainage;"[50]

    e.  any LDs not so deducted are "immediately due and payable to Owner upon demand . . .;"[51] and

---

[46] Ex. "D," p. 5.
[47] Ex. "A," 4.5.1.
[48] *Id.*, Art. 4.5.
[49] *Id.*, Art. 4.5.1.
[50] *Id.*
[51] *Id.*

    f.   recovery of LDs "shall not limit, waive, or reduce Owner's other rights and remedies under [the Contract], or Owner's rights and remedies at law or in equity."[52]

**f.    Unwarranted Change Orders (e.g., 176 R2, CO 2R, 179 R2, and 188) and Contractor Misrepresentations**

112.    The facts surrounding Change Order 176 R2 ("CO 176 R2"), among other Contract Documents, demonstrate Contractor's mismanagement of the Project as well as its intentional misrepresentations to Owner, made to induce Owner to enter into multiple Contract modifications — for example, CO 176, CO 2R, 170R, and 188 — that proximately caused Owner significant financial injury.

113.    The sequence of events leading up to these Contract modifications starts with negotiations and transactions predating execution of the Contract.

114.    Between the summer of 2019 and approximately March 2020, Contractor began the site and foundation work for a predecessor Owner, Key Int'l Investors II, LLC ("Key II"), culminating into a contract, dated March 6, 2020 (the "March Contract") for the entire construction of the Project.

115.    On March 31, 2020, Key II properly terminated the March Contract for convenience, due to the uncertainties presented by a global pandemic ("COVID Termination").

---

[52] *Id.*
[52] *Id.*

116.    On December 20, 2020, Owner and Contractor entered into the Contract, applying retroactively to August 19, 2019, under which Contractor recommenced construction of the Project.

117.    In January 2021, Owner learned that CAT 5 Structures, LLC ("CAT 5") — Contractor's shell Subcontractor responsible for cast-in-place concrete ("CIP") and concrete masonry unit ("CMU") under the March Contract — would not remobilize after the COVID Termination to perform work under the Contract.

118.    Contractor consequently declared CAT 5 in default, and in early 2021 replaced CAT 5 with GCF, Inc. ("GCF"), for the CIP scope and another Subcontractor, Bormon Construction, Inc. ("Bormon"), assumed the CMU scope.

119.    The default and replacement increased the Cost of the Work for CIP by several hundred thousand dollars.

120.    Notably, the original budget for CIP was $2,731,628.00, which CAT 5 committed to complete for $2,575,000.00 — creating a potential savings on this line item of $156,628.00.

121.    When CAT 5 defaulted, $1,933,485.16 had been paid for CIP, with $641,514.90 remaining available on CAT 5's commitment, and $798,142.84 remaining available on the original budget.

122.    CAT 5's replacement, however, proposed to complete the CIP scope for $1,519,507.00, resulting in a $721,364.00 cost overrun of the original budget,

and $877,992.00 cost overrun of the CAT 5 commitment, due to Contractor's mismanagement — a substantial "bid bust."

123.    Consequently, Contractor submitted to Owner PCO # 2 to add an another $725,577.80 to the Cost of the Work to account for overruns associated with and resulting from CAT 5's default — a Contractor liability under the Contract.

124.    In good faith and regrettably, Owner allowed Contractor to utilize $300,000.00 from the Electrical Contingency — monies set aside to cover unforeseen electrical costs, risks, events, or changes in scope — and agreed to execute CO 2R for an additional $425,577.80, amounting to a $725,577.80 executed Change Order for CIP.

125.    Notably, this PCO did not request an extension of time, and CO 2R does not provide for an extension of time.

126.    On or about August 2021, and again due to Contractor's mismanagement of the Project, GCF's contract was terminated due to Subcontractor's performance.

127.    Several months thereafter, Bormon also assumed the CIP scope GCF had abandoned.

128.    In the fall of 2021, Contractor posted cash bonds to remove the liens filed by GCF's suppliers.

129.    Shortly after GFC's termination, Contractor retained a new senior project manager, Rob Simpson, who later revealed the Project was concerningly overbudget and behind schedule, an unsafe and unclean disaster area, with lack of supervision by superintendents, and staffed by management that literally did not know or care about the schedule.

130.    Most importantly, Mr. Simpson revealed that Contractor had engineered a deceptive scheme to hide its mismanagement of the schedule and budget from Owner in order to extract as many funds as possible under the loan, and to lien the Project when it came time to reveal its mismanagement so that, as he put it, "maybe the losses would never show up."

131.    To this end, on November 8, 2021, via Pay App 20, Contractor represented to Owner that the CIP and CMU Work was 100% complete, and continued to make similar representations — i.e., that these scopes where either substantially or 100% complete — until February 2023.

132.    As a result of payment disputes Contractor itself created, Contractor liened the project for the first time in June of 2022.

133.    In connection with these payment disputes, and way before Owner learned of the deceptive scheme, the parties' decision-makers met on June 27, 2022, where an agreement was reached, under duress.

134.    In connection with this agreement, Owner executed CO 176 R2 on July 14, 2022, granting Contractor a 263-day extension to substantially complete the Project, and an additional $686,877.10 to the Cost of the Work, subject to capped monthly General Conditions — tellingly, Contractor withdrew and amended PCOs for this scope in excess of six times (e.g., PCO 83 R7, PCO 154, PCO 176).

135.    On or around the time these negotiations were taking place, Mr. Simpson learned of the deceptive scheme: that Contractor had been hiding losses for a long time and otherwise secretly mismanaging the budget and schedule; he also suspected criminal activity.

136.    As Mr. Simpson put it, Contractor's deceitful "plan was to put more liens on the job and have [Contractor] terminate the contract for non-payment;" "stop the money flow, get liens in place [*sic*] then try to get Killian to terminate for non-payment."

137.    Mr. Simpson resigned from Contractor on approximately July 6, 2022, and reported the deceitful scheme he had discovered to Tony Smith, Contractor's CEO, via email on July 10, 2022, 4 days before Owner was fraudulently induced, under duress, into executing CO 176 R2, as well as CO 179 and CO 188 for extended General Conditions for Subcontractors, Turnkey International, National Electric, and Bormon Construction in the amount of $1,021,139.56.

138.    For example, despite executing CO 2R, CO 176 R2, CO 179 and CO 188, Contractor fully intended to disregard the SCD and bill Owner in excess of the GMP Sum so as to enable it and its Subcontractors to file liens on the Project and thus "stop the money" flow from the Lender in order to beset Owner in multiple ways at once.

139.    The intent, as Mr. Simpson, warned, was: 1) for Contractor to lien the Project; 2) for Subcontractors ostensibly owed retainage monies to lien the Project; 3) to render Owner unable to access funds from the Lender due to non-compliant Pay Apps, waivers and releases of lien, and the Contractor's and its Subcontractors' liens; and 4) to force attendant default claims by Lender due to the non-compliant Pay Apps, waivers and releases of lien, and the Contractor's and its Subcontractors' liens — all manufactured to jam up Owner's relationship with the Lender and thereby "stop the money" flow.

140.    In Pay App 34, Contractor falsely represented the entirety of the Work was 99% complete, with $558,850.71 remaining in the Adjusted GMP Sum and $3,998,340.00 withheld in retainage, only to be followed by a series of Pay Apps and untimely and non-compliant Claims that exceeded the GMP Sum by almost $8mm.

141.    It was not until 2023, through acts such as attempting to carveout claims from the contractual waivers and releases of lien and submitting PCCO #344 to

Owner that Contractor ultimately revealed it was seeking an additional $2,305,254.69 for the CIP and CMU scopes of work as well as millions of dollars above the GMP Sum for other scopes of work — representing far less than the 1% of the Work, or $558,850.71, that Contractor previously certified was all that was left to complete the Project.

142.    Contractor's actions surrounding CO 2R rendered a malicious and intentional misrepresentation every Pay App, Schedule of Values, and accompanying waiver and release of lien after Pay App 20 that represented the CIP and CMU Work was either substantially or 100% complete, that no Claims would be made, and that all twelve sub-provisions in Article 8.4.4 of the Contract were met.

143.    Each of these intentional misrepresentations facilitated draws from the Lender and payments to Owner that would not have come due or been paid because a legitimate representation regarding these cost overruns would mean Owner and Lender were not required to review, approve, or make payment for any such Pay Apps, unless Contractor complied with the Claims-reduced-to-Change-Order Process, which Contractor undoubtedly failed to do.

144.    An adjunct to the deceitful scheme was that when Owner attempted to mitigate losses associated with Lender defaults and bond premiums and liens arising from retainage, Contractor would do everything in its power to interfere with

Owner's many good faith efforts, unless Owner would agree to waive liquidated damage and defect claims to which it is duly entitled.

### g.    Failure to Comply with the Contractual Payment Protocol Entitled Owner to Withhold Payment

145.    Owner was entitled to withhold payment from Contractor due to myriad reasons, including Contractor Default, inability or reasonable doubt as to the ability of Contractor to complete the Work for the unpaid balance of the GMP, and Contractor's failure to meet other contractually-imposed monetary obligations.[53]

146.    Due to Contractor's multiple defaults, including demonstrating an inability to complete the balance of the Work for the unpaid balance of the GMP, Owner rejected the Contractor's requests for payment in excess of the GMP submitted in Pay Apps 35 through 38, inclusive of withholding Subcontractor retainage payments.

### h.    Contractual Waiver Provisions

147.    Under Article 8.4, Contractor's failure to submit compliant Pay Apps rendered the Pay Apps rejected and relieved Owner of its obligation to review or approve it.[54]

148.    In the event that a Pay App was not balanced, Contractor's failure to timely and properly submit a PCO for any amount not within the remaining GMP

---

[53] *Id.*, Art. 8.6.
[54] *Id.*, Art. 8.4.2.

Sum and failure to make a Claim to increase the GMP Sum in strict compliance with the Contract, via separate Change Order, constituted a legal waiver of any right to increase the GMP Sum.[55]

149.   Change work performed by Contractor without an executed Change Order or other fully executed amendment constituted an acceptance by Contractor that the Work was within the GMP Sum,[56] constituting a waiver of any right to payment for the extra work initially presented as a PCO or a Claim.

150.   Similarly, "[i]f Contractor proceed[ed] to perform a change in the Work without a Change Directive or Change Order, then such performance [would] constitute Contractor's acceptance that the change in the Work [was] included as part of the Contract Time and the then current [GMP Sum]."[57]

151.   A great deal of Contractor's Pay Apps were non-compliant and not balanced, relieving Owner of any obligation to review or approve said Pay Apps.

152.   Contractor also failed to submit timely and substantively-compliant PCOs to increase the GMP Sum via separate Change Order, in strict compliance therewith, constituting a legal waiver of any right of Contractor to increase the GMP Sum.

---

[55] Id., Art. 6.1.6 and 6.1.14.
[56] Id., Art. 7.1.1.
[57] Id.

153.    Contractor further allegedly performed millions of dollars of change work without an executed Change Order or other fully executed amendment, and that Work constituted an acceptance by Contractor that the Work was within the GMP Sum, also constituting a waiver of any right to payment for the extra work initially presented in untimely and non-compliant PCOs and Claims.

154.    Simply put, Contractor waived any and all claims for increases in the GMP Sum above $54,253,774.59, as a result of its failure to follow the claims-reduced-to-change order process, among a variety of other acts of misfeasance and malfeasance.[58]

155.    Moreover, a fully executed "Change Order **constitute[d] a full settlement**, satisfaction, and accord with respect to all Claims of Contractor **relating to the subject matter of the Change Order**, including . . . adjustments . . . in the [GMP Sum] and/or Contract Time."[59]

156.    Therefore, when Owner and Contractor, for example, fully executed CO 2R in February 2021 relating to the "[o]riginal concrete budget for Cast in Place Concrete," in the amount of $725,577.80, CO 2R became a "full settlement, satisfaction, and accord with respect to all Claims of Contractor relating to" the concrete budget for cast in place concrete, as was the case with any and all time

---

[58] *Id.*
[59] *Id.*, Art. 7.2.1. (Emphasis added).

impacts to the schedule Contractor knew or should have known about at the time the parties executed CO 176 R2, on July 14, 2022.

157.   As it relates to Owner, any failure by it to insist upon strict performance of any Contract provision did <u>not</u> constitute a waiver thereof.[60]

158.   Moreover, "[n]o action or failure to act by Owner" could constitute a waiver of a right, remedy or privilege afforded Owner under the Contract.[61]

159.   Thus, all Contractor allegations that Owner received non-compliant indications via informal email and verbal communication regarding Claims Contractor intended to make, without Owner expressly objecting to such an informal process, are of no legal consequence, as any failure to insist upon strict performance did not constitute a waiver of the payment and Claims provisions and such alleged inaction could not constitute a waiver of any Owner rights, remedies, or privileges under the Contract.

### i.   Contractual Requirements to Defend and Indemnify

160.   Under Article 11.16 of the Contract, "if Contractor or any Subcontractor or Sub-subcontractor wrongfully or fraudulently records a claim of lien against the Project . . . then Contractor shall indemnify and hold Owner harmless from any and all damages, costs and expenses (including attorneys' fees and costs)

---

[60] *Id.*, Art. 24.17.
[61] *Id.*, Art. 24.18.

which may be incurred by Owner as a result of such wrongful or fraudulent claim of lien."[62]

161.    Owner has demanded that Contractor defend and indemnify Owner with regard to Subcontractor claims of lien on the Project (i.e., liens filed by CDM Windows & Door, Inc., D & M Industries, Inc., TK Elevator Corp., CI Energia Solar S.A.S. Windows, Inc, Bormon Construction, Inc., Turnkey International, Inc., and Broussard Plumbing, Inc.).[63]

162.    Contractor has failed to assume the defense of or indemnify Owner with regard to these Subcontractor claims of lien on the Project, entitling Owner to liquidated and other damages under the Contract.[64]

### j.    Contractor's Obligation to Produce Financial Records

163.    The Contract obligated Contractor to maintain complete books, records, and accounts for the Project to Owner's satisfaction.[65]

164.    Contractor was further obligated to permit Owner during regular business hours to "inspect, audit and copy, **all** of Contractor's records, books and accounts, including **complete documentation** supporting accounting entries, books,

---

[62] *Id.*, Art. 11.16.
[63] Ex. "D," pg. 5.
[64] Ex. "A," Art. 8.9.4 and 11.16.
[65] *Id.*, Art. 22.6.

instructions . . . proposals . . . memoranda and other data relating to the Contract and the Project[,]"[66] upon reasonable notice ("Owner's Audit Rights").

165.    On April 10, 2023, Contractor issued its wrongful Notice of Default to Owner which, even if warranted, did not relieve Contractor from its contractual obligations, as the Contract does <u>not</u> allow Contractor to terminate until at least 37 days after its initial declaration of default.[67]

166.    Owner invoked its Audit Rights on April 11, 2023, specifying to Contactor that,

> Owner is demanding "access and shall be permitted to inspect  audit and copy, **all** of Contractor's records, books and accounts, including **complete documentation** supporting accounting entries, books, instructions . . . proposals . . . memoranda and other data relating to the Contract and the Project." *See* § 22.6. Owner will coordinate with Contractor to arrange, during regular business hours, a time for Owner to inspect, audit and copy such information.[68]

167.    On April 14, 2023, Contractor breached its obligation to comply with Owner's Audit Rights, responding to Owner's request that Contractor only was "amenable to Owner inspection of [only one Subcontractor's] records."[69]

168.    On April 25, 2023, Owner properly served Contractor with a Declaration of Default, wherein Owner re-invoked its audit rights and put Contractor

---

[66] *Id*. (Emphasis added).
[67] Ex. "E," Pg. 3.
[68] Ex. "F," Pg. 3. (Emphasis added).
[69] Ex. "G," Pg. 4.

on notice that "[f]ailure to comply with this demand shall constitute another material breach under the Contract."[70]

169.    Appended to the April 25, 2023 re-invocation of Owner's audit rights was a detailed list of financial materials prepared by Owner's forensic accountant setting forth a detailed list of documents Owner wanted to inspect.[71]

170.    On April 27, 2023, Owner followed-up, with the undersigned stating "can you please let us know by week's end how we can secure the financial materials required pursuant to Pier Park Resort Hotel, LLC's audit rights?"[72]

171.    Finally, on May 3, 2023 — 19 days after the initial invocation of audit rights — Contractor responded to Owner that this

> request comes after Owner was declared in breach of the Contract thus Owner does not continue to enjoy such audit rights. However in the spirit of resolving this dispute, Killian is amenable to inspection of its Project-specific records. Please let us know which records the Owner would like to inspect.[73]

172.    On May 4, 2023, Owner Terminated Contractor pursuant to the Contract's termination provisions.[74]

---

[70] Ex. "H," Pg. 16.
[71] Ex. "I."
[72] Ex. "J."
[73] Ex. "K."
[74] Ex. "L."

173. On May 8, 2023, Owner again followed up with Contractor regarding its multiple requests for financial records and Contractor's previous representation of amenability.[75]

174. On May 11, 2023, legal counsel for the parties conducted a conference wherein Contractor asserted that Owner did not have audit rights because the Contract was terminated but that Killian was evaluating whether it will produce its books.

175. Owner documented the conference, providing same to Contractor via email.[76]

176. Ultimately, Contractor did not produce its financials to Owner pursuant to the Contract, even though the initial request was made 23 days before Owner formally terminated the Contract.

**k.    Contractual Requirements for Contractor to Suspend and Terminate**

177. In addition to Contractor's nefarious intentions to jam up Owner's relationship with its Lender and cause the Project to be doubly and triply liened, in addition to Contactors various and sundry material breaches of the Contract, and in addition to Contractor's failure to assume the defense against wrongful and/or fraudulent claims of lien, Contractor wrongfully stopped the prosecution of its Work

---

[75] *Id.*
[76] Ex. "M."

on the Project — an intentional breach Contractor knew would disrupt Owner's operations.

178. To emphasize the importance of continued, meaningful progress of the Work, Article 6.3 of the Contract provides in bold font that:

> **Contractor shall not stop the Work pending approval of a Claim, or pending the resolution of a dispute over whether a Claim should be approved, or during the pendency of a Claim, dispute, or other controversy between Owner and Contractor. Contractor shall diligently perform the Work during the pendency of any Claim or dispute or controversy arising out of the Contract Documents.**[77]

179. Under the Contract, Contractor was not permitted to stop the Work until after Owner committed a material breach, and after Contractor followed conditions precedent, consisting of:

    a. declaring a default, and copying the Lender; and

    b. providing Owner an opportunity to cure ("Owner Default Provisions").[78]

180. Specifically, had Owner failed to pay a requisition that was due, which did not occur, Owner would be in default if it "fail[ed] to pay Contractor the undisputed amounts in a Requisition within thirty (30) days after . . . payment . . . [was] due to Contractor as provided in the Contract."[79]

---

[77] Ex. "A," Art. 6.3. (Emphasis supplied).
[78] *Id.,* Art. 19.1. and 19.1.3.
[79] *Id.*

181.    "If Owner . . . fail[ed] to cure an Owner Default no later than thirty (30) days after receipt of written notice from Contractor . . . then Contractor [would be entitled to] terminate the Contract with an additional seven (7) days' prior written notice to Owner . . ."[80]

182.    Only after proper notice of a failure to pay undisputed amounts 30 days after they were due, a 30-day opportunity to cure, Owner's election not to cure, and an additional "seven (7) days prior written notice to Owner and Lender," was Contractor permitted to terminate the Contract.[81]

183.    On April 7, 2023, Contractor unilaterally demobilized the majority of its forces from the Project (leaving only a skeleton crew onsite to address miscellaneous ADA issues), even though it had <u>not</u> terminated the Contract in accordance with Article 19 — the Owner Default Provisions.

184.    Contractor simultaneously froze Owner out, willfully failing to answer telephone calls and correspondence regarding outstanding items from Owner's Vice President of Development, Anthony Straessle.

185.    Three days thereafter, on April 10, 2023, acknowledging it had not achieved substantial completion, Contractor issued its wrongful Notice of Default,

---

[80] *Id.,* Art. 19.1.1.
[81] *Id.,* Art. 19.1.2.

erroneously asserting Owner was in material breach of the Contract for failure to timely satisfy Contractor's draws.[82]

186. Owner sent Contractor another notice on April 13, 2023, and instead of rectifying the issue, Contractor proceeded to revoke all access to the project management software platform.

187. That is, on April 22, 2023, Contractor brazenly revoked Owner's access to the project management platform, Procore, preventing Owner from monitoring or participating in the ongoing Owner Punch-List process, accessing project documentation, including Requests for Information ("RFI"), Submittals, photographs, and project logs, and ultimately closing the Project out; Contractor also unilaterally authorized punch list items, even though Owner had not consented, constituting another material breach of the Contract under Article 11.21.

188. This revocation was based on Contractor's same wrongful notice of default, upon which the improper demobilization was predicated.

189. Notably, Owner first notified Contractor on January 19, 2023, that Owner's punch list items were being closed by Contractor's staff.

190. At that time, Contractor alleged it had been a mistake, yet continued closing and/or modifying hundreds of items, eventually restricting Owner's ability

---

[82] Ex. "E."

to modify existing observations or re-open items unilaterally closed out by the Contractor's staff or its Subcontractors.

191.    Contractor's subsequent conduct demonstrates Contractor's true intentions when it initially claimed it was a "mistake."

### l.    Contractual Requirements for Owner to Terminate

192.    Among other breaches, if Contractor failed to achieve Substantial Completion within the Contract Time, perform and complete the Work in *strict compliance* with the Contract Documents, perform its obligations under the Contract, or fail to make payments to its Subcontractors in accordance with the terms of the Contract, Contractor "would be in default of the Contract."[83]

193.    If Contractor failed to "commence to cure, and diligently pursue cure of a Contractor Default no later than (5) business days after Contractor's receipt of written notice from Owner," or if Contractor failed to fully cure such Default within 30 days of written notice, Owner was entitled to, among other options, "terminate the Contract with written notice to Contractor . . ."[84]

194.    Due to Contractor's numerous material breaches, on April 25, 2023, Owner furnished Contractor with its Response to Killian's Wrongful Notice of Default, Owner's Demand for Liquidated Damages and Immediate Specific

---

[83] Ex. "A," Art. 18.1.
[84] *Id.*, Art. 18.1.1.

Performance, and Owner's Declaration of Default and Notice to Terminate ("Owner's Notice").[85]

195.    In addition to detailing Contractor's various intentional and egregious defaults, Owner's Notice laid out discrete demands, including but not limited to a demand:

      a.  to immediately allow Owner back into the Procore platform;

      b.  that Contractor immediately remobilize the entirety of its workforce in order to finalize the Punch-List Work on the Project;

      c.  that Contractor immediately satisfy the Claim of Lien filed by C.D.M. Windows & Door, Inc. (given the pervious notice and demand);

      d.  that Contractor completely satisfy Owner's demand for liquidated damages; and

      e.  that Contractor produce its financial materials as per Section 22.6 of the Contract.

196.    Contractor failed to respond to, let alone satisfy, any of Owner's demands.

197.    Contractor, therefore, failed to cure or commence to cure any defaults identified in Owner's Notice.

---

[85] Ex. "D."

198.    Because Contractor failed to commence to cure and diligently pursue cure of its defaults within five (5) days of Contractor's receipt of Owner's Notice, Owner terminated the Contract pursuant to Section 18.1.1.[86]

199.    Owner's termination of the Contract did not amount to a waiver of any Owner right or remedy.[87]

200.    Various Contractor obligations survived Owner's proper termination of the Contract.[88]

### 4.    Post Termination

### a.    Construction Defects

201.    On the Project, Contractor was obligated to " . . . perform all Work in a good and workmanlike manner in conformance with **the best of modern trade practice and in strict compliance with the Contract Documents."**[89]

202.    Contractor was further obligated to use the materials of "the most suitable grade," and of the  "highest and best quality."[90]

203.    All of Contractor's workmanship was supposed to be "first class."[91]

---

[86] Ex. "L."
[87] Ex. "A," Art. 18.1.2.
[88] *Id.*, e.g., Art., 12.5, 14.8, 15.7, 16.9, 21.3, and 24.6
[89] *Id.*, Art. 11.10. (Emphasis added).
[90] *Id.*
[91] *Id.*, Art. 11.0.1.

204.    Contractor agreed to be "responsible for the costs and repairs associated with defective, ill-timed, damaged, or improperly located Work."[92]

205.    To the extent Contractor failed to comply with its clear and unequivocal duties to perform its Work not just in a good and workmanlike manner, but to provide first-class workmanship in conformance with the best of modern practice, in strict compliance with the Contract Documents, and with the materials of the most suitable grade (as well as highest and best quality), Owner had the authority to:

> reject any portion of the Work which is damaged, defective, or otherwise [did] not strictly conform to the requirements of the Contract Documents, and Contractor [was required to] promptly correct all Work so rejected by Owner, whether observed before or after the date of Substantial Completion . . . according to a schedule established by Owner . . . Contractor [to] bear all costs of correcting rejected Work . . . [r]efusal to promptly correct all work rejected [to] be deemed a Contractor Default . . .[93]

206.    Moreover, the Contract provides that

> [i]f Contractor fails to correct any defective Work or Work that otherwise fails **to strictly comply with the requirements of the Contract Documents**, then Owner may correct it in accordance with the Contract. If Owner corrects any such defective or non-compliant Work, then Owner may deduct the costs of correcting the Work, including compensation for additional Architect or other design professional services, attorneys fees made necessary thereby, from any amounts then, or thereafter due to Contractor under the Contract. If the amounts then, or thereafter due to Contractor under the Contractor are insufficient to cover such costs, then Contractor shall, upon demand, pay the difference to Owner.[94]

---

[92] *Id.*, Art. 11.24.2.
[93] *Id.*, Art. 11.24.2.
[94] *Id.*, Art. 11.24.5.

207.    Contractor agreed to opt out of the requirements of Section 558, Florida Statutes, for any claims arising out of or related to its Work on the Project.[95]

208.    On July 16, 2023, Owner served Contractor with correspondence that detailed the construction defects theretofore discovered at the property ("First Notice-and-Opportunity-to-Cure").[96]

209.    The First Notice-and-Opportunity-to-Cure put Contractor on notice of a variety of defective and incomplete components — including but not limited to guestroom barn doors, interior framing, guestroom showers, lighting controls, and HVAC systems — demanding repair and replacement in accordance with the Contract.[97]

210.    On June 30, 2023, Contractor responded to the First Notice-and-Opportunity-to-Cure by largely disavowing its obligation to deliver a first-class product in conformance with the best of modern practice, with the materials of the highest and best quality and most suitable grade.[98]

211.    Thereafter, on July 20, 2023, Owner provided Contractor further detail regarding defects set forth in First Notice-and-Opportunity-to-Cure, granting Contractor additional time to reconsider the demands made in the June 30, 2023

---

[95] *Id.*, Art. 24.21.
[96] Ex. "D."
[97] *Id.*, pg. 5-7.
[98] Ex. "N."

letter, and again demanding repair and replacement in accordance with the Contract ("Second Notice-and-Opportunity-to-Cure).[99]

212.    Ultimately, Contractor failed to repair any of the defects set forth in the First and Second Notice-and-Opportunity-to-Cure, causing Owner to suffer significant direct and consequential damages for which Contractor is solely responsible.

213.    Recently, on September 13, 2023, Owner placed Contractor on notice of additional defects regarding the EIFS system, ductwork on the roof, balcony dividers, railings on the roof, rusty steel components on the stairs, mushrooms in room 526, and countertop and tiles near the pool area ("Third Notice-and-Opportunity-to-Cure").

214.    Contractor responded to the Third Notice-and-Opportunity-to-Cure on September 20, 2023, disavowing any responsibility but simultaneously requesting an inspection date to obtain more information and indicating it will put the implicated Subcontractors on notice. Thus, it is unclear whether Contractor will or will not repair the defects set forth in the Third Notice-and-Opportunity-to-Cure.

215.    While Owner disagrees that Contractor needs further information regarding these defects, in good faith, Owner reserves filing suit on these defects until Contractor has an opportunity to inspect and promptly thereafter

---

[99] Ex. "O."

(unambiguously) represent to Owner whether it will or will not repair these defective elements of its Work. Should Contractor fail to repair these defective elements, Owner reserves the right to seek leave to amend the Counterclaim to add claims and seek damages relating to the defects set forth in the Third Notice-and-Opportunity-to-Cure.

### b.   Wrongfully Clouding Owner's Title

216.   Early in 2023, several Subcontractors filed claims of lien against the Project in the amount of retainage, i.e., 10% of the Subcontractors' contract sums, because the Subcontractors had not received those amounts.

217.   Owner admittedly had not released the retainage because Contractor had failed to satisfy multiple conditions precedent to payment, not the least of which is representing there were not sufficient funds with the GMP to complete the Project, rendering the Subcontractors' liens wrongful and unenforceable.

218.   Contractor similarly filed a claim of lien against the Project for the same retainage monies allegedly due and owed the Subcontractors, except Contractor added monies to its lien Bormon has since acknowledged were paid to it by Owner.

219.   Since early 2023, Contractor and Owner have participated in a variety of settlement discussions, including ones concerning how to pay some or all of the Subcontractors' retainage monies, even though not due and owing.

220. In many of those settlement discussions, Contractor repeatedly insisted that Owner waive its claims against Contractor in exchange for Contractor recording in the public records a partial release of lien in recognition of the monies distributed.

221. In a genuine good faith effort to narrow the issues and pay some of the Subcontractors retainage monies, even though not contractually due and owing, on July 17, 2023, Owner tendered performance of subcontractor retainage, in exchange for a Partial Waiver and Release of Lien from Contractor and Final Waiver and Release from the Subcontractors — a tender that amounted to $1,982,730.00.

222. On July 21, 2023, Contractor in bad faith rejected the tender of performance, by "conditionally accepting" on different terms.

223. Contractor's terms included a demand that Owner:

   a. fully and finally "accept" all of Turnkey's, Broussard's, Bormon's, and TK Elevator's work (i.e., under Contractor's definition, waive all patent and latent defect claims); and

   b. waive any delay/liquidated damages resulting from the scopes of work of these Subcontractors.

224. Appended to Contractor's response was a proposed lien waiver and release that, unconscionably, sought to reserve Contractor's claim against Owner for nearly $8,000,000.00 above the GMP Sum, after Owner waived its claims for liquidated damages for delay and replacement of Key Personnel.

225. In other words, Contractors purported "good faith" response to Owner's July tender of performance was to seek, quite literally, everything Contractor sought,

in exchange for nothing more than allowing Owner to pay the Subcontractors their retainage — all on the heels of Contractor demanding that Owner provide Contractor an allocated critical path analysis to use as a pretext for a slush fund it erroneously entitled "indemnity."

226.   On August 2, 2023, Contractor finally agreed, it seemed, to provide the partial release of lien in exchange for a release of retainage to Bormon, if "Owner agree[d] it [only] wa[s] unaware of any defects with the scope of Bormon's work, **but all parties reserve rights as to any unknown, hidden defects.**"

227.   It was then, on August 2nd, that for the first time Contractor seemingly dropped the requirement that Owner waive all of its claims against Contractor in exchange for recording partial releases of lien in the amount of the retainage paid to at least one Subcontractor.

228.   On August 10, 2023, Owner again attempted to release retainage to the Subcontractors, pursuant to the Contract and Lien Law, in exchange for final and partial releases commensurate with the monies received, with Owner's claim for liquidated damages and Contractor's claim for costs exceeding the GMP Sum being preserved.

229.   In response, Contractor in part reverted to a demand that Owner "waive known defect claims," and "acknowledge that its . . . delay claims . . . have nothing

to do with Bormon's scope of work," a position very similar to its July 21, 2023 demand.

230.    On August 14, 2023, the undersigned endeavored to plainly convey to Contractor that Owner is "not waiving <u>any</u> defect or delay claims but that it would like to help the Subcontractors out by releasing retainage in exchange for the aforementioned releases."

231.    On August 17, 2023, Contractor pivoted to a new, equally unsubstantiated position, claiming Owner's failure to "approve" the Work excuses Contractor from providing Owner with partial releases for the retainage monies Owner has tendered, pursuant to Section 4.8 of the Subcontracts.

232.    Contractor's use of "approve" is fleshed out by the following statement by Contractor: "The Owner cannot hold a defect claim in its back pocket and then pursue that defect against Contractor later. If the Owner neither knows of any defects in the subcontractors' work **nor has any current intention of conducting an inspection of the subcontractors' work**, then the Owner should have no problem putting that in writing." That is, Contractor has manufacturer the notion that "having a current intention of conducting an inspection of" Work constitutes disapproval of Work — an outlandish and non-sensical premise that flies in the in the face of virtually every construction project, where owners approve work, pay contractors,

and continue to reserve the right to inspect work pursuant to statutes of limitation and repose.

233.    That is, Contractor's use of the term "approve" was <u>wrong</u>.

234.    Under the Contract Documents, while "[n]o approval shall be given if Subcontractor is in default," Owner may "pay Contractor Retainage attributable to such Subcontract in its sole, but reasonable discretion."

235.    In other words, while not obligated to do so, Owner may opt to pay Subcontractor retainage, as it has now attempted to do on multiple occasions. However, "Owner's decision" to do so "shall not be deemed to be Owner's <u>acceptance</u> of the Work or any portion thereof, including . . . Work performed by such Subcontractor."[100]

236.    That is, "approval" and "acceptance" of defective Work are different terms with different meanings under the Contract.

237.    Like Contractor (section 4.5 of Subcontract), Owner may "approve" without "accepting" defective Work, which is what it has proposed and Contractor has repeatedly rejected.

238.    In fact, the Contract includes redundancy insofar as it provides that: "Owner's release of Retainage shall not be deemed to be Owner's acceptance of the Work or any portion thereof;" "Nothing contained in this Section 8.3 shall be

---

[100] Ex. "A," Art. 8.3.2.

deemed a waiver of any right or remedy of Owner"; and "Owner's issuance of any payment . . . shall not be deemed to, constitute acceptance of any defective Work . . . or a waiver of any right or remedy . . ."[101]

239.    Under the Contract, Owner can approve Work, release retainage, and make final payment without waiving claims for defective (or delayed) Work, all in exchange for the appropriate releases as per the Contract Documents.

240.    The Subcontracts are in line with the Contract in that " . . . Subcontractor agrees that the **approval and payment of Subcontractor's Application for Payment does not constitute or imply acceptance by the Construction Manager or Owner of any portion of the Subcontractor's Work."** (Emphasis added).

241.    The purpose of Contractor's proposed construct was to estop Owner from suing Contractor for defects by inducing Owner into making representations that are not required by the Contract on which Contractor would argue it detrimentally relied in order to settle the claims and distribute the retainage, only (Contractor would argue) to later be sued for "back pocket" defects or defects it could have discovered during a timely inspection. It was a trap.

---

[101] *Id.*, Art. 8.3.3, 8.4.7.

242. This negotiating tactic by Contractor was designed to continue to unjustifiably cloud title and continue to jeopardize the Owner's obligations to Lender.

243. Contractor's intentional misuse of "approval," to include "acceptance," constitutes an additional breach of the Contract and Contractor's duties of good faith and fair dealing, the purpose of which is to continue slandering Owner's title.

## 5.   Other Acts of Misfeasance and Malfeasance by Contractor

244. In addition to the myriad breaches set forth above, Contractor often failed to ensure its Subcontractors promptly paid the lower tier subcontractors and suppliers for the labor, material, equipment, and/or services furnished in connection with the Project, as per its contractual obligations.

245. For example, the electrical subcontractor, National Electric Company, ("NEC") failed to pay multiple vendors even though the work in-place had been paid by Owner.

246. Contractor's Pay App 28, dated August 4, 2022, included NEC's payment requisition No. 16, dated June 23, 2022, that indicated the generator's line item was 100% complete at $210,000.00, for which Owner had paid Contractor $199,500.00, excluding 5% retainage.

247. However, according to the Contractor's Final Payment Affidavit, the generator material supplier, Evapar, is still owed $179,813.50.

248. Additionally, the low voltage, fire alarm and BDA Sub-subcontractor of NEC, Gulf Coast Fire & Integration, Inc., has not been paid $186,277.71, even though Contractor and its Subcontractor received partial payments for this Work.

249. Apart from its mismanagement of payments to lower-tier Subcontractors, Contractor also severely mismanaged the Change Order process.

250. For example, as to Contractor's alleged claims that amount to $7,855,921.23 for pending change orders, the disputed PCOs it submitted include Work that is unquestionably included in the original scope of work, as well supplemental labor and acceleration activities to recover delays, remedial work of defective work, numerous scope gaps, unbilled PCOs, and cost overruns for which Owner is not responsible — these are Contractor's responsibilities.

251. Contractor's alleged claims also include $93,562.86 for change order requests that were previously voided, more specifically PCOs 079R, 110R, 117, 139, 141, 159, 163, 167, and 175, as evidenced by the PCO log submitted by Contractor on February 24, 2023 — notably, Contractor was either unable to provide sufficient documentation to support the alleged changes in scope, and/or realized the requests were invalid, and as result withdrew these during the course of construction.

252. For example, PCO #163 in the amount of $13,690.74 included duplicative charges for guestroom bath accessories settled under OCO #84R.

253.   The door closers in PCO #167 were a material substitution requested by Contractor in the amount of $29,991.00 — $25,583.88 per the Second Amended Complaint.

254.   The rooftop crossover ramps on PCO #175 for $43,315.10 ($31,531.81 in the Second Amended Complaint) were voided on July 7, 2022, and were never installed.

255.   Additionally, Contractor sought additional compensation for Work already included in the construction documents.

256.   PCO 110R for Card Readers was included in the original permit set and is also included in PCO 335 (as part of #347).

257.   Contractor is also seeking compensation of over $919,000.00 for unbilled general conditions that exceeded the contractual Cost Cap set forth in Article 6.1.7.2 of the Contract.

258.   Under Article 5.5 of the Contract, Contractor is responsible for paying any General Conditions Costs incurred by Contractor in excess of the General Conditions Cost Cap, without reimbursement or compensation from Owner.

259.   Contractor is seeking $3,198,601.81 for defaulted subcontractors, but Contractor is not entitled to a time extension, increase in the GMP, or any other type

of compensation from Owner for delays caused, in whole or in part by its or its Subcontractors' own acts, omissions, negligence, fault, or default.[102]

260.   Contractor is seeking $1,217,110.86 for supplemental and acceleration costs allegedly incurred by Contractor for drywall framing, flooring, door, and wallcovering activities — all costs to supplement labor are solely the responsibility of Contractor; all costs to apply extraordinary measures to accelerate the delayed project were to be at Contractor's sole cost.[103]

261.   Contractor is claiming over $500,000 for material escalation that occurred as a direct result of untimely buyout.

262.   As set forth in Article 5.9, Contractor is solely responsible for paying any and all costs, fees, or expenditures in excess of the GMP Sum, without entitlement to reimbursement from Owner.

263.   Contractor is seeking $97,513.46 for additional scope performed by Bormon that Bormon itself is not seeking, including costs for scope of work that is irrefutably part of the GMP Sum, as in, for example, materials and labor to install the pool coping that was part of the pool Subcontractor's scope, and over $17,500.00 for Time and Material ("T&M") Work to correct defective or non-conforming Work.

---

[102] *Id.*, Art. 6.1.9.
[103] *Id.*, Art. 4.

264.    Contractor is seeking $812,938.09 as part of PCO #335, that included over sixty (60) individual change order requests not billed during the course of construction.

265.    By Contractor's own admission, the PCOs were non-billable, several of which consisted of cost overruns due to scope gaps for Work included within the GMP budget, repairs of defective or non-conforming Work, double charges, and other like items that do not constitute a material/time impact to Owner.

266.    Contractor proceeded to perform work without providing notice of cost impacts or an approved Change Order, and as such, the performance constituted acceptance from the Contractor as per Article 5.8 of the Contract.

267.    Of the $812,938.09 in PCO 335, Contractor is claiming $203,100.70 for costs associated with the base, grading, and layout for the pool deck pavers (PCO 353 and 356).

268.    This scope of work was undoubtedly included in the Contract Documents and GMP, and the GMP line item for this Work was not an allowance.

269.    Failing to properly estimate the quantity, material, or labor associated with the pool deck does not entitle Contractor to compensation or an increase of the GMP, as under Article 5.9 of the Contractor, Contractor is solely responsible to pay, any and all costs, fees, or expenditures in excess of the GMP, without entitlement to reimbursement from Owner.

270.    In PCO 335, Contractor included duplicative claims, including PCO 336, which was included as part of PCO 203; PCOs 354 and 355, which were included in OCO 270R, even though the additional LVT flooring materials were previously settled under OCO 84R; and PCO 365, which was included in PCO 163 —previously settled as part of OCO 84R.

271.    Contractor is seeking $458,875.22 for additional costs for NEC, which includes $306,994.45 for two contract extensions beyond November 15, 2022, which Contractor agreed on multiple occasions were not due —extension requests that exceeded the Contract Time, which remained unchanged until November 15, 2022.

272.    Neither Contractor nor NEC was entitled to a time extension, increase in the GMP Sum, or any other type of compensation from Owner for delays caused, in whole or in part by their acts, omissions, negligence, fault, or default.[104]

273.    Most importantly, Contractor did not incur these costs, and the Subcontractor demobilized on or about February 2023.

274.    The additional costs are not attributable to the Owner, including Work within the Contract Documents, extraordinary measures, repairs as a result of lack of coordination, and the $49,611.38 to accelerate permanent power activities that were shared by both Owner and Contractor, and settled as part of OCO 147R.

---

[104] *Id.*, Art. 6.1.9.

275. As Owner's fiduciary, Contractor was required review the Change Order Requests prior to submitting them to Owner, but Contractor evidently negligently or intentionally failed to do so.

276. Also of note, Contractor submitted an untimely Claim to Owner via PCO 293, on or about January 27, 2023, for meeting room soffit coves, in the amount of $32,188.05.

277. Contractor appended to PCO 293 a two-page invoice from a Subcontractor named Duggan Contracting and Carpentry, purporting to support the $32,188.05 PCO amount.

278. However, upon information and belief, this precise scope of work — meeting room soffit coves — was performed by another Subcontractor, Bormon Construction, as part of its original scope of work.

279. Additionally, PCO 298, also an untimely Claim contains demonstrably inflated and unreasonable charges for Terrace Column Base work also by Dugan Contracting and Carpentry.

## 6. <u>Conclusion</u>

280. Owner's damages flowing from Contractor's multiple, intentional and unintentional breaches include, direct, special, incidental and consequential damages, costs, interests, and attorneys' fees pursuant to Sections 713.29 and 713.31, Florida Statutes and the Contract. Owner's damages include payments for

overstated Pay Apps, the cost to repair and replace defective work, costs associated with renegotiating Owner's Construction Loan, stigma and reputational damages, pre-judgment interests, liquidated damages, and punitive damages resulting from Contractor's fraudulent lien.

281.   For the reasons stated above and more fully set forth below, Owner requests that the Court enter final judgment determining, among other things, that:

    a. Contractor committed multiple prior material breaches of contract and fraud which excused Owner's further performance;

    b. Contractor materially breached the Contract, and caused Owner damages and as a setoff against damages awarded Contractor;

    c. Contractor's lien is unenforceable because it is fraudulent, willfully exaggerated, and because Contactor breached the Contract, including express and implied warranties;

    d. Contractor has unclean hands and is not entitled any equitable relief, including lien foreclosure; and

    e. Owner in entitled to money damages and equitable relief.

## COUNT I — BREACH OF CONTRACT

282.   Paragraphs 1-281 are re-averred and re-alleged as if fully set forth herein.

283.   Owner contracted with Contractor for construction services related to the Project.

284.   Contractor breached the Contract by charging excessive amounts for the Work performed by it and its Subcontractors, and Sub-subcontractors, which

exceeded industry rates and standards for labor, materials, and/or equipment, falling woefully behind schedule, intentionally providing inaccurate cash flow projections for the latter months of the Project, providing inaccurate constructions costs, performing defective and noncompliant Work, filing a fraudulent lien against the Property, prematurely demobilizing its forces from the Project, failing to provider Key Personnel, unilaterally blocking Owner's access to Procore platform, misrepresenting certified information to Owner and its Lender, not completing the Work, and for constructing Work that was not in accordance with the Contract and applicable codes.

285.    Contractor's material breaches caused Owner damages as a result of the delays in the operation, construction, and opening and/or non-opening of all facilities involved in the Project, the injury to Owner's business relationships, reputation, and credit-worthiness, costs to complete the wrongfully abandoned contract, lost opportunity costs, costs to investigate and remediate defective Work and costs to repair damage caused by defective Work, liquidated damages, lost profits, attorneys' fees and costs associated with Lender obligations, pre-judgments interests, attorneys' fees and costs associated with defending Subcontractor liens, and the decreased value of ongoing business concerns.

WHEREFORE, Owner, Pier Park Resort Hotel, LLC, demands judgment against Contractor, Killian Construction Co., for damages, attorneys' fees, interest,

costs and such other and further relief as this Court deems just and equitable.

## COUNT II — BREACH OF WARRANTY

286.    Paragraphs 1-281 are re-averred and re-alleged as if fully set forth herein.

287.    Contractor provided products and services for which an express warranty was provided in, among other sections, Article 12 of the Contract.

288.    As set forth above, a variety of the products and services Contractor provided failed to conform to the warranties.

289.    The Work was defective during the warranty period.

290.    Owner has provided notice to Contractor of defects but Contractor has failed or refused to honor its express warranties and Owner has suffered damages as a result.

WHEREFORE, Owner, Pier Park Resort Hotel, LLC, demands judgment against Contractor, Killian Construction Co., for damages, attorneys' fees, interest, costs and such other and further relief as this Court deems just and equitable.

## COUNT III — BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

291.    Paragraphs 1-281 are re-averred and re-alleged as if fully set forth herein.

292.    Contractor and Owner entered into the Contract.

293.    Contractor consciously and deliberately failed or refused to discharge

its contractual responsibilities thereunder and unfairly frustrated the very purpose of said Contract.

294.    By its actions and omissions, whether intended or otherwise, Contractor has deprived Contractor of the benefits of those contract provisions, and its expectations thereunder, and as a direct result, Owner has been severely damaged.

WHEREFORE, Owner, Pier Park Resort Hotel, LLC, demands judgment against Contractor, Killian Construction Co., for damages, attorneys' fees, interest, costs and such other and further relief as this Court deems just and equitable.

## COUNT IV — FRAUDULENT LIEN

295.    Paragraphs 1-281 are re-averred and re-alleged as if fully set forth herein.

296.    Contractor recorded its Amended Claim of Lien on May 12, 2023, fraudulently liening the Project for excessive and exaggerated amounts for defective and delayed Work.

297.    Contractor willfully exaggerated the claim of its lien and willfully made a claim for monies that have not come due. Contractor compiled its claim of lien with such willful and gross negligence as to amount to a willful exaggeration by filing the lien with complete disregard for the terms and conditions of the Contract and Loan Agreement vis-à-vis conditions precedent to payment, Owner's withhold rights, the liquidated damages flowing from Contractor's delays and failure to

provide Key Personnel, and not completing or defectively completing Work and yet billing for same.

298.    Contractor, moreover, has caused duplication, and even triplication, of liens clouding Owner's title by deliberately preventing Owner's access to loan proceeds by interfering with Owner's genuine good faith efforts to release retainage to Subcontractors, even though the monies have contractually not come due.

299.    This conduct by Contractor is a per se violation of Section 713.31(2), Florida Statutes.

300.    Contractor has been damaged by the fraudulent lien, and such damages include reasonable attorneys' fees and costs incurred in defending the lien enforcement action, prosecution of this fraudulent lien action, and disparagement of Owner's business reputation, business relationships, and credit-worthiness.

WHEREFORE, Owner, Pier Park Resort Hotel, LLC, demands judgment against Contractor, Killian Construction Co., for damages, punitive damages, statutory punitive damages, attorneys' fees, interest, costs and such other and further relief as this Court deems just and equitable.

## COUNT V — BREACH OF FIDCUIARY DUTY

301.    Paragraphs 1-281 are re-averred and re-alleged as if fully set forth herein.

302.    At all times material, Owner and Contractor shared a relationship

whereby Owner reposed trust and confidence in Contractor and Contractor undertook such trust and assumed a duty to advise, counsel and/or protect Owner, as Contractor agreed to "accept[] the relationship of trust, confidence, and fiduciary responsibilities established by the Contract, and acknowledged[] Owner's reliance thereon, and covenant[ed] with Owner to: . . . **exercise** Contractor's professional **skill and judgment in furthering the interests of Owner**;" "to furnish, and cause each Subcontractor . . . to furnish, at all times, adequate supply of workers and materials;" "**exercise**, with respect to Owner, **the highest standards of good faith and fidelity**;" "to cooperate in all respects with the Design Professionals and owner in the bidding and construction phases;" "to function as part of the design and construction team . . for the purpose of facilitating the design and construction of the Work in the most expeditious and least costly manner consistent with the requirements of first class quality." [105]

303.    Contractor breached its fiduciary duties by:

a. failing to thoroughly inform its management of the Project's schedule and budget;

b. grossly failing to manage the Project schedule and budget;

c. perpetrating a scheme to lien the Project and leverage Owner into waiving claims for liquidated damages, construction defects, and wrongful liens;

d. perpetration a scheme to lien the Project and leverage Owner into

---

[105] *Id.*, Art. 2.1. (Emphasis added).

paying millions of dollars in excess of the GMP Sum;

e.  intentionally certifying and submitting to Owner false Pay Apps;

f.  intentionally submitting and failing to honor the waivers and release of lien appended to the false Pay Apps;

g.  exceeding the GMP Sum by millions of dollars and charging Owner for same in the absence of a Claim;

h.  failing to defend and indemnify Owner with regard to several Subcontractor claims of lien;

i.  fraudulently liening the Project;

j.  refusing to produce its financial records to Owner;

k.  improperly stopping the Work and demobilizing its forces from the Project;

l.  blocking Owner's access to the Procore platform and unilaterally authorizing incomplete items; and

m. failing to cooperate with Owner and correct Contractor's defective Work in light of Owner's Notices-and-Opportunities-to-Cure.

304.  Contractor's multiple breaches of its fiduciary duties caused Owner to suffer damages as a result of the delays in the operation, construction, and opening and/or non-opening of all facilities involved in the Project, the injury to Owner's business relationships, reputation, and credit-worthiness, costs to complete the wrongfully terminated contract, liquidated damages, lost opportunity costs, costs to investigate and remediate defective Work, loss of beneficial use and enjoyment of the property, and costs to repair damage caused by defective Work, lost profits and

the decreased value of its property and ongoing business concerns.

WHEREFORE, Owner, Pier Park Resort Hotel, LLC, demands judgment against Contractor, Killian Construction Co., for damages, punitive damages, attorneys' fees, interest, costs and such other and further relief as this Court deems just and equitable.

## COUNT VI — FRAUD IN THE INDUCEMENT

305. Paragraphs 1-281 are re-averred and re-alleged as if fully set forth herein.

306. Contractor made false statements regarding material facts, and otherwise concealed or knowingly failed to disclose material facts, to Owner, including but not limited to statements and omissions in connection with:

    a. the sequence of events surrounding CO 2R, CO 176 R2, CO 179 R2, and CO 188, and fraudulent Pay Apps 35-38, *supra Sec. f.*;

    b. Contractor covering up and failing to reveal to Owner just how drastically Contractor had lost control of the budget and schedule; and

    c. Contractor's scheme to whipsaw Owner by, on the one hand, creating pressure from its lien and Subcontractor liens, and on other hand, from Owner's lender which requires the Project be free of liens.

307. Contractor knew these statements were false when made.

308. Contractor had a duty and professional responsibility to disclose to Owner the material facts it knowingly omitted.

309.    Contractor intended that Owner rely on these false statements and material omissions in order to induce Owner to facilitate payment, as evidenced by, among other things, the false Pay Apps, PCCO #344, and untimely and non-complaint claims in which Contractor revealed it sought $2,305,234.69 for CIM and CMU Work and millions of dollars in excess of the GMP Sum for other scopes.

310.    Owner relied on these false statements and material omissions to its detriment.

311.    Contractor's deceptive scheme, perpetrated by a series of false statements and materials omissions, resulted in the unwarranted payment of $725,577.80 and unwarranted 263-day extension to the schedule, the $1,021,139.71 in extended general conditions, the unwarranted payments for every Pay App after Pay App 20, delays in the operation, construction, and opening and/or non-opening of all facilities involved in the Project, the injury to Owner's business relationships, reputation, and credit-worthiness, costs to complete unfinished and defective Work, lost opportunity costs, costs to investigate and remediate defective Work, liquidated damages, loss of beneficial use and enjoyment of the property, lost profits, and the decreased value of its property and ongoing concerns.

WHEREFORE, Owner, Pier Park Resort Hotel, LLC, demands judgment against Contractor, Killian Construction Co., for damages, punitive damages, attorneys' fees, interest, costs and such other and further relief as this Court deems

just and proper.

## COUNT VII — FRAUD IN THE PERFORMANCE

312.    Paragraphs 1-281 are re-averred and re-alleged as if fully set forth herein.

313.    As described in Rob Simpson's email to Tony Smith, Contractor resolved to fraudulently lien the Project and force Owner to terminate the Contract months before the SCD.

314.    In this regard, Contractor made certifiably false statements regarding material facts, and otherwise concealed or knowingly failed to disclose material facts, to Owner when:

      a.  in every Pay App after Pay App 20 that falsely indicated the CIP and CMU scopes were either substantially or 100% complete and where Contractor certified under Article 8.4.4 that:

            i.  "to the best of Contractor's knowledge, information and belief . . . all amounts have been paid by Contractor for work for which previous Certificates for Payment were issued and payments received from the Owner;"

           ii.  "**there are no liens or claims outstanding or known to exist** at the date of the Requisition, other than as indicated in writing in such Requisition;"

          iii.  "**all due and payable bills with respect to the Work have been paid to date**, or have been included in the amount requested in the previous Requisition;"

          iv.  "there is **no known basis for the filing of any construction liens or claims or any other lien or claim whatsoever on the Work**, the Project, or the Site;"

    v.   Contractor was entitled to payment under the Contract in the amount requested; and

   vi.   "there are **no outstanding PCOs or CORs other than those PCOs and/or CORs included within Contractor's Monthly Report;"**

b.  in Pay App 34, Contractor attached a Schedule of Values, in which it represented the Work was 99% complete with $3,998,343.00 withheld in retainage, and $558,850.71 remaining on the GMP Sum of $54,199,773.14 — the undisputed GMP Sum;

c.  in, Pay App. 34, Contractor certified that "to the best of Contractor's knowledge, information and belief . . . all amounts have been paid by Contractor for work for which previous Certificates for Payment were issued and payments received from the Owner;"

d.  in Pay App 34, Contractor certified under Article 8.4.4. of the

Contract that:

    i.   **"there are no liens or claims outstanding or known to exist** at the date of the Requisition, other than as indicated in writing in such Requisition;"

   ii.   **"all due and payable bills with respect to the Work have been paid to date**, or have been included in the amount requested in the previous Requisition;"**

  iii.   "there is **no known basis for the filing of any construction liens or claims or any other lien or claim whatsoever on the Work**, the Project, or the Site;"

   iv.   Contractor was entitled to payment under the Contract in the amount requested;

    v.   "there are **no outstanding PCOs or CORs other than those PCOs and/or CORs included within Contractor's Monthly Report;"** and

vi. "there are **sufficient funds left in the GMP to complete the Work.**"

e. Contractor made similar representations in the waivers and release of lien appended to Pay App 34.

315. Contractor knew these statements were false when made.

316. Contractor had a duty and professional responsibility to disclose to Owner the material facts it knowingly omitted.

317. Contractor intended that Owner rely on these false statements and material omissions in order to wrongfully secure payment.

318. Owner relied on the false statements and material omissions to its detriment when it authorized as such Pays Apps and unwittingly facilitated the Lender's release of the those funds, in support of Contractor's scheme to:

a. force a Contract termination when Owner learned Contractor has grossly exceeded the GMP Sum;

b. induce Subcontractors to lien the Project;

c. itself lien the Project for duplicate and triplicate amounts allegedly due and owing; and

d. jeopardize Owner's contractual relationship with its Lender due to the wrongful cloud on title Contractor manufacturer in order to leverage Owner to:

i. pay Contractor millions of dollars in excess of the GMP Sum; and

ii. waive its delay, defect, and all other claims against Contractor.

319.   Contractor's deceptive scheme, perpetrated by a series of false statements and material omissions, resulted in the unwarranted payment of $725,577.80 and unwarranted 263-day extension to the schedule, the $1,021,139.71 in extended general conditions, the unwarranted payments for every Pay App after Pay App 20, delays in the operation, construction, and opening and/or non-opening of all facilities involved in the Project, the injury to Owner's business relationships, reputation, and credit-worthiness, costs to complete unfinished and defective Work, permit-extension fees, lost opportunity costs, costs to investigate and remediate defective Work, liquidated damages, loss of beneficial use and enjoyment of the property, lost profits and the decreased value of its property and ongoing business concerns.

WHEREFORE, Owner, Pier Park Resort Hotel, LLC, demands judgment against Contractor, Killian Construction Co., for damages, punitive damages, attorneys' fees, interest, costs and such other and further relief as this Court deems just and equitable.

## DEMAND FOR ATTORNEYS' FEES AND COSTS

Defendant, Pier Park Resort Hotel, LLC, demands attorneys' fees and costs incurred in connection with this action pursuant to Article 24.4 of the Contract, and the Florida Lien Law, Section 713, Florida Statutes.

Dated this 21st day of September 2023.

Respectfully submitted,
COLE, SCOTT & KISSANE, P.A.

*/s/ David Salazar*
GEORGE R. TRUITT, JR., ESQ.
Florida Bar No: 963356
George.Truitt@csklegal.com
DAVID SALAZAR, ESQ.
Florida Bar No: 21984
David.Salazar@csklegal.com
DAVID BORUCKE, ESQ.
Florida Bar No: 39195
David.Borucke@csklegal.com
9150 South Dadeland Boulevard, Suite 1400
Miami, Florida 33156
Telephone: (305) 350-5300
Yvette.Batlle@csklegal.com
Gabriela.Delgado@csklegal.com
Alison.Collier@csklegal.com

## CERTIFICATE OF SERVICE

I hereby certify that on September 21, 2023, I electronically filed the

foregoing with the Clerk of Court using the CM/ECF, which will send a notice of

electronic filing to all counsel of record.

By: */s/ David Salazar*
    *Attorney for Pier Park Resort Hotel, LLC*

**SERVICE LIST**

Jeremy Springhart, Esq.
Florida Bar. Number: 0506052
Jeremy.springhart@nelsonmullins.com
Lacey Delori Corona, Esq.
Florida Bar Number: 0066454
lacey.corona@nelsonmullins.com
390 North Orange Avenue
Suite 1400
Orlando, Florida 32801
Telephone: (407) 669-4200
Nancy.Haarmann@nelsonmullins.com
Vicki.mattison@nelsonmullins.com
Erica.dixon@nelsonmullins.com
*Attorneys for Plaintiff, Killian Construction Co.*

*David Salazar*
DAVID SALAZAR